75 P.2d 320

## MORUZZI v. FEDERAL LIFE & CASUALTY CO.

### No. 4320.

Supreme Court of New Mexico.

Jan. 10, 1938.

Crampton & Robertson, of Raton, for appellant.

Fred J. Federici, of Santa Fé, and Floyd W. Beutler, of Taos, for appellee.

Quincy D. Adams, of Santa Fé, amicus curiæ.

ZINN, Justice.

This suit was brought in the district court of Colfax county by Santa Moruzzi, appellee here, plaintiff below, widow of John Battista Moruzzi, deceased, to recover death benefits under a policy of accident insurance. By its answer, the Federal Life & Casualty Company, defendant below, appellant here, admitted the existence of the policy, but denied most of the remaining material allegations of the complaint and set up as an affirmative defense a release executed by the insured after the injury but prior to his death. By her reply, the appellee admitted the facts set up in the answer concerning the release, but sought to avoid the effect of the release by certain allegations respecting mistake, fraud, and want of consideration.

After the case was at issue, the appellant filed a disqualifying affidavit disqualifying Judge Taylor from trying the cause. Instead of agreeing upon another district judge to try the case, the parties, acting through their attorneys of record, designated F. S. Merriau, Esq., of Raton, N. M., a member of the bar, to hear and determine the cause and act as judge pro tempore therein.

By this same stipulation, the parties eliminated certain issues of fact raised by the pleadings.

The case was tried before Mr. Merriau on April 28, 1937. Neither party offered any evidence, but certain additional facts were stipulated. The parties then united in requesting the court to render judgment on the facts admitted by the pleadings, by the written stipulation, and by the facts orally stipulated.

Final judgment was rendered in favor of the appellee in the amount of $501.67, together with costs in the amount of $11.50, and together with interest at 6 per cent. from the date of the judgment. From this judgment the appellant prosecutes this appeal.

The facts in this case are as follows:

John Battista Moruzzi was employed by Phelps Dodge Corporation at Dawson, N. M., as a mason and plasterer. Though a man of meager education, he was able to read, write, and understand the English language. On January 30, 1936, Moruzzi received a personal injury through being struck on the head by some boards falling from a scaffold. Immediately following the injury and throughout the period of his disability, he consulted and was attended by a physician and surgeon who was then in the employ of Phelps Dodge Corporation. Moruzzi was disabled for a period of fourteen days, and immediately after the termination of that period he returned to work at his regular employment and continued at such work until the evening of March 12, 1936, which was approximately one month after his return to work. On that evening, he was taken ill, and died early the following morning. Moruzzi's death was a direct and proximate result of the injury.

At the time of the injury, Moruzzi was insured by an accident insurance policy, which had been issued in June, 1924, by Federal Casualty Company of Detroit, Mich., and thereafter assumed by the appellant.

The policy insured Moruzzi, as follows:

"The This policy insures against— (1) the effects Insuring resulting directly and exclusively of all other Clause causes, from bodily injury sustained during the life of this policy solely through External, Violent and accidental means (excluding suicide, sane or insane), said bodily injury so sustained being hereinafter referred to as 'such injury,' and

"(2) disability resulting from illness. which is contracted and begins during the life of this policy and after it has been maintained in continuous force for thirty days from its date, hereinafter referred to as such illness, as follows:

"Part I.—Principal Sum and
 Monthly Indemnities.

"Principal Sum Five Hundred Dollars

"Monthly Accident Indemnity Fifty Dollars

"Monthly Illness Indemnity Fifty Dollars.

"Part II.—Accident Insurance—
 Specific Losses.

"If 'such injury' alone shall within ninety days from the time of the accident, result in any one or more of the following specific losses, the Company will pay, in lieu of all other indemnity the sum specified below for such loss, provided that not more than one such indemnity shall be payable as the result of any one accident.

"For Loss of Life—The Principal Sum

"For Loss of Both Eyes—The Principal Sum

"For Loss of Both Hands—The principal Sum

"For Loss of Both Feet—The Principal Sum

"For Loss of One Hand and One Foot —The Principal Sum

"For Loss of either Foot—One Half the Principal Sum

"For Loss of Either Hand—One Half the Principal Sum

"For Loss of Either Eye—One Third the Principal Sum.

"In every case referred to in this policy, the loss of any member or members shall mean loss by severance at or above a point of articulation of the wrist joints or ankle joints, and the loss of an eye shall mean the total and irrevocable loss of the entire sight thereof.

### "Part III.—Sixty Per Cent. Accumulations.

"For each consecutive month immediately preceding the date of the accident that this policy shall have been maintained in continuous force without default by payment of the premium on or before the first day of each month when due, one per cent. of the original principal sum of this policy shall be added to the indemnity provided in Part I, for loss of life, but the total amount of such additions shall never exceed sixty per cent. of such original principal sum.

### "Part IV.—Monthly Accident Indemnity.

"Temporary Total Disability. Sec. (a) Or, for the period of total loss of time, not exceeding three consecutive years, during which 'such injury' alone shall from date of the accident wholly and continuously disable the Insured from performing any and every duty pertaining to his occupation, the Company will pay accident indemnity at the rate per month specified in Part I;

"Permanent Total Disability. Sec. (b) And, after said period of three years and so long as the Insured shall live and continuously suffer total disability as defined in Sec. (a) of this part, the Company will pay one-fourth of said Monthly Accident Indemnity;

"Temporary Partial Sec. (c) Or, if 'such injury' shall not from date of accident wholly disable the insured but shall within thirty days thereafter wholly disable him, or shall, commencing on date of the accident or immediately following total loss of time, prevent him from performing work substantially essential to the duties of his occupation, the Company will pay as indemnity for the continuous peri-

od of loss of time caused thereby, not exceeding six consecutive months, one-half of said Monthly Accident Indemnity. .

"Provided that indemnity under this Part shall not be paid for disability resulting from any loss specified in Part II; nor in excess of the time the Insured is under the regular treatment of a legally qualified physician or surgeon."

The additional provisions of the policy material to a determination of the issues raised by the appeal are paragraph 7 of the standard provisions of the policy which required the insured to furnish affirmative proof of loss in case of claim for loss of time from disability within ninety days after termination of the period for which the company is liable, and paragraph (b) of the miscellaneous provisions of the policy which provides: "Insured may at any time release the company from any and all liability then existing or thereafter accruing to the beneficiary."

On or about February 4, 1936, Moruzzi executed and sent to the appellant a preliminary notice of accident bearing on the reverse side the preliminary report of the attending surgeon. The printed form of this preliminary notice had already been in Moruzzi's possession along with the policy, and it was received by the appellant on or immediately prior to February 10, 1936.

Question 9 contained in the preliminary notice of accident was answered by Mo-ruzzi as follows: "If paid at once without requiring further proofs, what number of days indemnity are you willing to accept in full payment and satisfaction of your claim for this injury? 14 days."

On receipt of the preliminary notice, the appellant on February 10th sent by mail to Moruzzi a letter accepting his proposal of settlement and inclosing the company's check in the amount of $23.33.

That part of the face of the check material hereto, is as follows:

"Pay to the order of John Batista Mourzzi $23.33 Insured

G. I. C. 313 $23 & 33 cts. Dollars, "Being in full and final compromise settlement of all claims against this company under its policy No. 454894 for any accidental injury or illness, or its or their effects, originating prior to date hereof. "Federal Life and Casualty Company "J. A. Kennedy, Treasurer.".

The appellant sent this check prior to the expiration of the estimated fourteen days' disability and without any opportunity to investigate the accident and without requiring final proof. Moruzzi received the letter and the check and indorsed and negotiated the check with the receipt and indorsement appearing on the reverse side. On the reverse side of the check appearing immediately above the signature of Moruzzi is the following receipt: "Received of the Federal Life and Casualty Company the amount named on face hereof in full payment and compromise settlement, release and discharge, of any and all claims made or to be made as herein stated, and all liability of the company by reason of such injury or sickness or its or their

effects, are hereby fully satisfied and dis-·charged."

Following Moruzzi's death, which occurred over one month after the check was sent to him, the appellee, widow of Moruzzi and the beneficiary named in the ·policy, brought this action to recover the death benefit. In addition to claiming the face amount of the policy ($500), she asked for extra accumulations under part III of the policy. There is no issue in the case on that feature. It is admitted by stipulation that if the appellee is entitled to ·recover the death benefit, then there should be added an amount equal to 5 per cent. thereof.

The appellee did not tender to the company the amount of $23.33 paid to Moruzzi in his lifetime.

The trial court concluded that the beneficiary was entitled to recover judgment against the appellant for the sum of $500 (the face amount of the policy sued on) ·plus $25 (being 1 per cent. of the death benefit per month for a period of five months) less $23.33 (the amount paid by the insurer to Moruzzi), and rendered judgment for the total net sum of $501.67, together with costs in the amount of $11.50.

Four points are advanced by appellant for our consideration. The first is an attack upon the jurisdiction of Mr. Merriau, the judge pro tempore, to render any' judgment. The other three ·may be summarized as follows:

: ' ·Appellant claims that when Moruzzi accepted the appellant's check in the sum of $23.33 and indorsed the same as above recited, and cashed the same and accepted the proceeds, it amounted to an accord and satisfaction, compromise, or release of any and all claims not only that Moruzzi himself may have had against ' appellant, but also all claims appellee, as beneficiary, had against appellant under the terms of the policy and such acceptance of the check by Moruzzi discharged the appellant from all liability. Appellant also claims that the appellee's failure to tender the sum of $23.33, the amount paid to Moruzzi, is fatal to her recovery of the amount she claims as beneficiary under the policy.

We shall first dispose of the jurisdictional question. When this question was raised by appellant, we deemed it of sufficient importance to bench and bar of this state to request aid of amicus curiæ. We acknowledge our thanks to the Hon. Quincy D. Adams, who as amicus curiæ, at our request, so ably presented the matter in his brief.

 Appellant concedes that an agreement was had with appellee that Mr. Merriau should act as judge pro tempore after Judge Taylor had been disqualified. Appellant also concedes that in so far as it was possible all objections that could be waived had been waived. Appellant contends, however, that inasmuch as the capacity of the judge to act is a jurisdictional matter which could not be waived, then if the judge pro tempore did not acquire

jurisdiction, the judgment rendered by him is void.

The appellant claims that a member of the bar may be selected by the parties to an action in the manner provided by N. M. Const., art. 6, § 15, where the judge of the district is disqualified from hearing any cause on account of the specific grounds for disqualification set forth in article 6, section 18 of the New Mexico Constitution, which reads as follows: "No judge of any court nor justice of the peace shall, except by consent of all parties, sit in the trial of any cause in which either of the parties shall be related to him by affinity or consanguinity within the degree of first cousin, or in which he was counsel, or in the trial of which he presided in any inferior court, or in which he has an interest."

The affidavit disqualifying Judge Taylor in the instant case was filed pursuant to the provisions of Laws 1933, c. 184, and it is the appellant's contention, that when a judge is disqualified pursuant to said chapter 184, then a judge pro tempore cannot be agreed upon by the parties pursuant to the provisions of article 6, section 15 of the N. M. Const.

The question then before us resolves itself into whether or not article 6, section 15, N. M. Const., can be applicable to a situation where the judge has been disqualified as the result of an affidavit filed under the provisions of Laws 1933, c. 184.

Laws 1933, c. 184, provides that after the filing of an affidavit of disqualification, "another Judge shall be designated for the trial of such cause either by agreement of counsel representing the respective parties or upon the failure of such counsel to agree, then such facts shall be certified to the Chief Justice of the Supreme Court of the State of New Mexico, and said Chief Justice of the Supreme Court of the State of New Mexico shall thereupon designate the Judge of some other District to try such cause."

At first blush it may seem that chapter 184 does contemplate the selection of another duly elected and qualified district judge to act in the place of the one disqualified. However, if article 6, section 15 of the Constitution, authorizes the selection of any member of the bar to try a cause where the district judge has been disqualified for any reason, then the Constitution must be held to supersede and qualify the statute to that extent.

The word "judge" as used in the statute, where counsel are authorized to designate him by agreement, is in itself broad enough to include a judge pro tempore as well as a district judge. If the Legislature had meant to say "district judge" where it authorized the designation of "another judge * * * by agreement of counsel," it would have been quite simple to use appropriate language to make that meaning plain. It is significant that it did not do so, but that, on the other hand, in authorizing the chief justice to designate a judge upon failure of the counsel to agree, the intention of the Legislature is

quite clear that the Chief Justice must designate "the judge of some other district to try such cause," and none other.

Chapter 184 makes it very clear as to the kind of judge to be designated by the Chief Justice. It is significantly silent as to the kind of judge to be chosen by the agreement of counsel. The conclusion seems inescapable that the Legislature intended to leave counsel free to choose any judge who was capable of acting. The reasonableness of such a conclusion seems even more apparent in view of the fact that the State Constitution recognizes the capacity of any member of the bar to act as judge pro tempore where the presiding district judge has been disqualified. Article 6, section 15, supra. There is no specific inhibition contained in the Constitution against the Legislature providing for such appointment in the manner outlined by chapter 184.

Appellant's suggestion that parties may select a member of the bar as judge pro tempore under article 6, § 15, only when the judge of the district is disqualified by reason of some cause mentioned in article 6, § 18, must be based upon the thought that the word "disqualified" as used in section 15, has reference only to cases where the judge is disqualified by reason of some constitutional ground of disqualification. In other words, the constitutional selection of a judge pro tempore must be based upon a constitutional disqualification of the presiding district judge. Appellant, however, overlooks the fact that the statute provides a constitutional means of disqualification.

The ground for disqualification provided by the statute is not unconstitutional. We have so held in State v. Armijo, 38 N.M. 73, 28 P.2d 511. The question was raised in the Armijo Case that article 6, section 18, of the Constitution provides the only means of disqualification of judges, and that the Constitution makers intended to exclude all others. We denied this contention. The arguments advanced by Mr. Justice Bickley in State v. Armijo, supra, for a liberal interpretation of section 18, apply with equal force for a liberal interpretation of section 15.

As pointed out in the Armijo Case, the object and purpose of section 18 is merely to indicate some of the sources of partiality in a judge without restricting the power of the Legislature to recognize and establish others. It must logically follow that in speaking of a judge being disqualified in section 15, the Constitution makers had in mind that the Legislature might, and probably would, designate other grounds of disqualification than those stated in section 18, and that whenever a district judge is disqualified, either by reason of grounds stated in the Constitution or by reason of grounds fixed by the Legislature in the exercise of its constitutional powers, a member of the bar may be selected as judge pro tempore to try the cause.

In order to give the statute the restricted meaning suggested by appellant it

would be necessary for us to insert in the statute prior to the word "judge" the word "district." It is not our province to supply words purposely omitted unless the omission is palpable and the omitted word plainly indicated by the context. Nor will words be added except when necessary to make the statute conform to the obvious intent of the Legislature or prevent the act from being absurd. At no time will words be added to declare an act of the Legislature unconstitutional when the omission of suggested additions will leave the act stand.

A statute is presumed to be constitutional in the absence of compelling reasons to the contrary. No reason has been suggested why the statute so construed as to permit the selection of a judge pro tempore would not conform to the State Constitution. Section 15 of article 6 of the Constitution recognizes the capacity of a member of the bar to act as judge pro tempore under certain conditions. "If any judge shall be disqualified from hearing any cause in the district, the parties to such cause, or their attorneys of record, may select some member of the bar to hear and determine said cause, and act as judge pro tempore therein."

There is no specific inhibition contained in this provision of the Constitution that such disqualification must be only for one of the causes specifically enumerated in N.M.Const., art. 6, § 18. The language is so plain and unambiguous that it requires no interpretation. If any judge

is disqualified, a judge pro tempore may be selected. The grounds of disqualification are not enumerated. It is such a simple statement, so all embracing, so clear, that its meaning is obvious.

The 1933 statute, Laws 1933, c. 184, has been before this court a number of different times. In the very recent case of State ex rel. Tittmann v. McGhee, 41 N.M. 103, 64 P.2d 825, 826, Mr. Justice Brice, who wrote the opinion, makes the following statement: "It is the public policy of this state, as evidenced by its Constitution and laws, that regularly elected or appointed district judges shall preside over its district courts unless, because of the disqualification of the trial judge, the parties to a suit agree that a member of the bar may try a particular case as judge pro tempore."

Although the exact point before us was not especially raised in that case, the statement by Mr. Justice Brice in that opinion was a forecast of our view on the point now in issue.

No logical reason has been suggested by appellant why the parties may agree upon a member of the bar to act as judge pro tempore when the resident district judge is disqualified by reason of relationship to one of the parties but they cannot do so when he is disqualified by reason of the filing of an affidavit of prejudice. We can see none. We must therefore conclude that the judgment of Mr. Merriau, who served as judge pro tempore upon agreement of the parties to this suit, was

in all respects as valid and binding upon the parties as though it had been rendered by the presiding judge of the district.

. We now come to the points raised by appellant claiming nonliability under its contract of insurance to the appellee, named as beneficiary therein.

■ The main question presented, and which we have concluded in favor of appellant and which is decisive of the case, is the one raised by appellant that the release signed by Moruzzi constitutes a complete defense to the suit brought by appellee as the beneficiary named in the policy.

It appears from the facts that Moruzzi, about five days after his injury, sent to the company the preliminary notice of accident advising the company that he would accept fourteen days' indemnity in full payment and satisfaction of his claim for the injury, if paid at once, without requiring further proofs. Immediately upon receipt of this notice, the company wrote back accepting the proposition and sending its check for $23.33 in full and final settlement of the claim. As heretofore recited the check shows on its face that it was in full and final compromise settlement of all claims against the company under policy No. 454894 for any accidental injury or illness or its or their effects, originating prior to the date of the check. The receipt and indorsement signed by Moruzzi appearing on the back of the check acknowledges receipt of the

amount of the check as being: "In full payment and compromise settlement, release and discharge, of any and all claims made or to be made as herein stated, and all liability of the company by reason of such injury or sickness or its or their effects, are hereby fully satisfied and discharged."

The check as tendered Moruzzi clearly states the purpose for which the same is tendered, and the release clearly sets forth the conditions under which Moruzzi signed the check and received the money. Though the amount paid Moruzzi appears ridiculously small, considering the maximum liability under the terms of the insurance policy, yet it is not the province of this court to make the contract for the parties, or guide them in their business affairs. In the absence of fraud, undue influence, or mutual mistake, we cannot set aside or avoid the release.

■ The general rule is that in order to set aside or avoid a written release, the evidence must be clear and convincing and beyond a reasonable controversy. See 53 C.J., Release, 1283 et seq., §§ 103 to 109, inclusive.

■ There is nothing in the record before us showing fraud or undue influence. There is likewise no showing of any mistake in the legal sense. Moruzzi knew that he had been injured. He did not know that the future effects and results of the injury would be death. The effects of the injury might have been temporary total disability or permanent

total disability. Brief of counsel for appellee practically concedes that they could not set aside the release in an effort to collect under either part IV, section (a) or section (b) of the policy if the injury had produced a result to be compensated under either one of said provisions instead of death. Both parties to the contract settled for all time their rights and obligations in respect of the injury which had already occurred, although neither party could foresee with certainty what the future effects might be.

It is the theory of the appellee that because Moruzzi did not know he was going to die as a result of the injury, therefore the release which he executed is void or voidable for mistake. Moruzzi may or may not have foreseen death. Unforeseeability, however, is not a "mistake" in the legal sense.

 Appellee contends that there was no consideration for the release. She argues that the insurance company was clearly liable to Moruzzi for fourteen days' indemnity under any circumstances, and hence the payment of the money for that loss did not furnish consideration for a release of any other claim which might be made under the policy. It is true that the payment of a liquidated, undisputed, matured obligation does not furnish a consideration for the release of any additional obligation. See Buel v. Kansas City Life Insurance Co., 32 N.M. 34, 250 P. 635, 52 A.L.R. 367. In that case, however, there was no dispute as to the liability of the company for the single indemnity. The insurance company paid the admitted single liability, and the plaintiff accepted it in full settlement and later brought suit to recover the added indemnity under the double indemnity provision. We held that the payment of the single indemnity was no valid accord and satisfaction because there was no consideration.

 In the instant case, however, Moruzzi's claim for disability indemnity was neither liquidated nor matured. True, there was no dispute about it in the sense that there was no active controversy or argument, but neither the company nor Moruzzi himself, for that matter, knew at the time of the settlement how long Moruzzi would be disabled. In the interest of a speedy settlement, Moruzzi was asked by appellant and he expressed his willingness to settle the whole claim on the payment of fourteen days' indemnity. He made this offer about five days after the injury, or about nine days prior to the expiration of the fourteen-day period. The company accepted the offer and sent its check in full payment. This was four days before the expiration of the estimated fourteen-day period. Manifestly, the claim for disability benefits was not liquidated. Clearly it was not matured.

We have held that where part payment is made of a disputed or unliquidated claim, the acceptance of such payment in full satisfaction of the entire claim is supported by a sufficient consid-

eration. See Frazier v. Ray, 29 N.M. 121, 219 P. 492; Nixon-Foster Service Co. v. Morrow, 41 N.M. 67, 64 P.2d 92; and Miller v. Prince Street Elevator Co., 41 N.M. 330, 68 P.2d 663.

Before the liability of the appellant could have attached, it had the right to demand final proof under the policy; and even after final proof was made, the claim would not be due for another thirty days. If the appellant had stood upon its strict legal rights, it could have demanded final proof, and payment would not have been due under the policy until later. But, instead of demanding final proof and awaiting all the time it had, the appellant made the payment at once without requiring further proofs. In addition, the company gave up its right to investigate the claim and inquire into its validity.

We are forced to hold, in light of the foregoing, that there was an adequate consideration for the release. The appellant in making the payment, without proof, before payment was due, performed beyond what it could have been compelled to do legally. . . .

In the annotation appearing at 24 A.L. R. 1475, after noting the general rule that ordinary part payment of a past-due, liquidated, and undisputed indebtedness will not discharge the whole, it is said: "The rule, however, does not apply to a payment made before maturity, however short the interval. And so it is established, with practically no dissent, by the cases,— some merely recognizing and others ap-

plying the doctrine,—that the payment, before maturity, of less than the amount of a liquidated and undisputed claim, in the satisfaction of the entire claim, affords a sufficient consideration to support the creditor's agreement to accept it in discharge of the entire claim."

A case on the question of lack of consideration and mistake of fact analogous to the one at bar is that of General Accident, Fire & Life Assurance Corporation v. Harris, 117 Miss. 834, 78 So. 778, 779, L.R.A.1918E, 929. It seems from a reading of the case that Harris suffered a dislocated hip, made final proof to the insurance company, and accepted the company's payment for disability, giving a full release. His disability actually lasted much longer than he thought, and he brought suit against the company to set aside the release which he had given. The court held that the release was valid, and said:

"It is contended by the appellee, Harris, that he is entitled to have the release set aside because at the time it was executed, first, there was a mutual mistake of fact upon his part and that of the company as to the nature, character, and extent of his injury; second, if not a mutual mistake, it was at least a mistake upon his part; third, that at the time of making the settlement under the policy he was already entitled to the $60 for which he settled, consequently there was no consideration for a release in full by him under the policy, but that the consideration only re-

lated to the three months he had already been totally disabled. The policy in this case provides that for total disability the insured is to be paid at the rate of $20 per month, but this payment is not due until final proof of total disability has been made. In other words, no amount whatever was due Mr. Harris under the policy until the final proof of total disability was made. Had he desired to wait until he was sure of the extent of his injuries under this policy, he would have waited for a period of 24 months, when he would have been entitled to a settlement at the rate of $20 a month for 24 months. He evidently thought, however, that he had practically recovered at the end of 3 months, and he and his physician so reported the fact to the company, and made a claim for only $60 for the injury. It is his contention that at this time he was mistaken as to the nature and extent of his injuries; that he thought his hip was only dislocated. The accompanying statement of his surgeon, however, shows that his hip was both dislocated and fractured, and this appears to have been the true state of the case. He must have been mistaken of course as to the extent of his disability. At the time he made the settlement he thought he had practically recovered. In this he was evidently mistaken. There was no fraud or misrepresentations whatever to him on the part of the appellant company. In fact, he was never examined by a surgeon of the company. The reports of himself and his attending surgeon were accepted by the company as being correct, and a settlement made with him according to his claim. In the statement of his surgeon, the nature and extent of his injuries are described as a fracture and dislocation. This the appellee certainly knew. The only mistake at all was as to the extent of the duration of his disability.

"We have examined carefully the authorities cited in the briefs of the appellant and appellee, and we find no well-considered cases that support the contention of appellee that under this statement of facts a court of equity should set aside a settlement duly entered into between the parties. The appellee, among other authorities, cites 6 Thompson on Negligence, par. 7378, as sustaining his contention that the release should be set aside because of a mistake of fact as to the nature and extent of the injuries of the appellee. It will be found from an examination of this section, however, and the authorities cited thereunder, that when the mistake is a mere matter of opinion, as it was in this case, as to the length of time the injured party would be disabled, and no fraud or misrepresentations were practiced upon him by the other party, the release will not be set aside."

Another case upon this point is the Texas case of Inter-Ocean Casualty Co. v. Johnston, 123 Tex. 592, 72 S.W.2d 583, 588. This was a suit for disability benefits. The insured received a scalp wound. He was treated by his own physician, who informed him that the injury was not

serious. He wrote the company advising that he would accept the amount of the hospital bill in full settlement. He sent in a form with the letter, which form contained this question and answer: "What are you willing to accept in full for this claim? Surgeon's fee of $23." The company wrote the insured sending a draft for $23 in full settlement of the claim. The insured cashed the draft, signing the receipt on the back thereof, which receipt read in part: "In full satisfaction, compromise and final settlement of all claims accrued or to accrue against" the company "on account of any accident already sustained and any disease and any illness heretofore contracted." The injury proved to be much more serious than the insured thought, and he brought suit and recovered judgment, after a jury trial, for $2,400, besides interest, penalty, and attorney fees. The Supreme Court of Texas reversed the judgment and said, speaking ·of plaintiff's contention that he had executed the release under a mistake of fact:

"The parties to this settlement clearly dealt with each other at arms' length. Johnston made an offer of settlement which covered all liability of the company for injuries arising out of his accident of January 3, 1925. The company formally accepted the offer, and required a full and complete written contract of release as a condition to the payment of its check. Johnston executed this full release and cashed the check. The company made no investigation of its own but accepted John-ston's word. The transaction as a whole shows that the company's acceptance of Johnston's offer was on condition that Johnston execute a ·full release for all claims, accrued and to accrue, arising out of the accident. Clearly such facts bring this case under the rule which applies to a settlement between parties who deal at arms' length.

"Also we think this record clearly shows that even if Johnston did enter into the release of his claim for damages ignorant of the full nature and extent of his injuries, nevertheless both parties fully intended that the settlement and release should cover all claims Johnston had against the company on account of the accident of January 3, 1925. This conclusively appears because Johnston made a proposition of full settlement. The company accepted the proposition without any investigation on its part, and Johnston executed a full release which in express terms covers a final settlement of all claims 'accrued or to accrue * * * on account of any accident already sustained.' There is no statement in the release showing or tending to show that it was only intended to cover hospital fees. To the contrary, the release by its express terms settles all claims 'accrued and to accrue.' Under no rule of law can it be said that this release only covers hospital fees already accrued at the time it was executed. Also such a record shows that the company entered into the settlement meaning to waive all inquiry into the extent of Johnston's injuries."

There are two cases from our neighboring state which are in point, and which we believe support the view adopted by us. The case of Mutual Benefit Health & Accident Ass'n v. Pittman, 39 Ariz. 218, 4 P.2d 1005, 1008, is one. In that case the insured under the accident policy made an advance compromise settlement. The insurance company doctor had examined the insured and gave an optimistic opinion, but the insured had not relied on it and, instead, had insisted on consulting an old family doctor, after which he himself submitted the offer of settlement. In a suit on the policy to cancel the release, reinstate the policy and recover additional benefits, the plaintiff recovered judgment in the trial court. On appeal this judgment was reversed by the Supreme Court of Arizona, which court said in part:

"It seems to us that where a party has a claim against another, whether it grows out of contract or tort, and the amount thereof is contingent upon future events or developments of uncertain nature, he ought to be allowed to convert such claim, by way of compromise, into a cash settlement; and that when after a full and independent investigation by himself, uninfluenced by his adversary, he sets the price he is willing to take, and it is given to him, he should be bound thereby. And that is the situation here. * * *

"In Chicago & N. W. Ry. Co. v. Wilcox, 116 F. 913, 914, 54 C.C.A. 147, the court, after stating that it was the policy of the law to promote and sustain compromises and settlements of disputed claims, said: 'It is not every mistake that will lay the foundation for the rescission of an agreement. That foundation can be laid only by a mistake of a past or present fact material to the agreement. Such an effect cannot be produced by a mistake in prophecy or in opinion, or by a mistake in belief relative to an uncertain future event. A mistake as to the future unknowable effect of existing facts, a mistake as to the future uncertain duration of a known condition, or a mistake as to the future effect of a personal injury, cannot have this effect, because these future happenings are not facts, and in the nature of things are not capable of exact knowledge; and everyone who contracts in reliance upon opinions or beliefs concerning them knows that these opinions and beliefs are conjectural, and makes his agreement in view of the well-known fact that they may turn out to be mistaken, and assumes the chances that they will do so. Hence, where parties have knowingly and purposely made an agreement to compromise and settle a doubtful claim, whose character and extent are necessarily conditioned by future contingent events, it is no ground for the avoidance of the contract that the events happen very differently from the expectation, opinion, or belief of one or both of the parties.'

"We think the general rule is, that a mere mistake of fact on the part of the parties to a release, in the absence of a showing of fraud, duress, undue influence,

or mental incapacity, is not sufficient ground for the avoidance of the release."

The other Arizona case, and the more recent case, is that of Mutual Benefit Health & Accident Ass'n v. Ferrell, 42 Ariz. 477, 27 P.2d 519, 525. This was an action brought to recover on a health policy for illness indemnity. The plaintiff had previously made a full settlement with the company for $500, but his illness continued and gave rise to the claim for additional compensation. The plaintiff had employed as his own physician the insurance company doctor. He sought to avoid the effect of the release by asserting that the doctor had misled him and that he had not read the release and that the company's agent had misrepresented its contents. The court held that the plaintiff's proof under the latter contention necessarily negatived his allegations under his first contention, and the court also held that the plaintiff's failure to read the release was not excused by the agent's misrepresentations. On the question of whether there was adequate consideration for the release, the court said: "There is but one other matter which requires our attention, and that is whether there was a legal consideration for the release. The evidence shows that defendant paid to plaintiff a certain portion of indemnity in advance of the time when it was due, based upon the estimation of the parties as to how long the disability would continue. A payment of money in advance of the time it is due is sufficient consideration for a contract. Reed v. McGregor et al., 62 Minn. 94, 64 N.W. 88."

Appellee, however, attempts to distinguish the cases above cited from the case at bar, upon the theory that each of the above cases involved a suit by the insured for additional compensation after release, whereas the instant case is a suit by the beneficiary for death benefits.

The cases are cited in support of the proposition that there was a consideration for the release in the instant case and no mistake of fact.

We now come to the proposition of whether the release, though binding on Moruzzi as conceded by appellee, is also binding on appellee as the beneficiary named in the policy. Appellee fails to give effect to the plain provisions of the contract of insurance. She concedes that Moruzzi, if, after executing the release, he had still been alive and subsequently found the effects of his injury to be more serious than originally anticipated, could not have recovered additional compensation. We can see no difference under the terms of the insurance contract when the suit is brought by the beneficiary.

The policy itself expressly provides: "The insured may at any time release the company from any and all liability then existing or thereafter accruing to the beneficiary." Moruzzi clearly had the power to bind the beneficiary by the release. The insuring clause of the policy makes it plain that the contract insures against accidental bodily injury and the effects of accidental bodily injury. The policy insures against loss from bodily in-

jury. The extent of the liability of the company is measured by the effects of the injury. The limitations on the liability of the appellant for accidental injury and its effects are found in part II. and IV of the policy. This, however, is clear, that the injury itself lies at the foundation of every claim which might be made under the policy whether the ultimate result be loss of time or death. Appellee's legal position in respect to the effect of the release upon her rights as the named beneficiary is no different in principle from the position she would be in had Moruzzi, even though not injured, released the appellant from its obligation under the insurance contract either by nonperformance on his part by not paying the premiums or because of a cancellation of the policy for a valuable consideration. Clearly the appellee could not complain. Wherein can she now complain because Moruzzi executed a release after injury?

Moruzzi had a clear right to let the insurance policy lapse for nonpayment of premiums. He had a clear right to release the insurer from additional liability for an injury suffered, and likewise for the ultimate effects of such injury even though death be the ultimate effect. The appellee could not be heard to complain under any of the circumstances just described.

A case squarely in point on the proposition before us is that of Wood v. Massachusetts Mutual Accident Ass'n, 174 Mass. 217, 54 N.E. 541, 542. In that case it appeared that Henry G. Wood was insured by the insurance company under a policy which provided for benefits in case of accident and for a death benefit in case of death. Wood sprained his ankle. He was under his doctor's care for over a month when his doctor discharged him. A few days later, he called on the examining surgeon of the insurance company and told him that he would be satisfied with six weeks' pay at $25 a week. The company paid this amount, and Wood signed a release "in full discharge of all claims which I have or may have on account of the personal injuries sustained," and also signed a receipt which contained the following language: "I do hereby release and discharge the said association of and from all claims and demands of every name and nature which I have against it under and by virtue of" the policy in question. After the giving of the release and receipt, Wood became much worse. He died about a month later from an embolism caused by the original injury. The beneficiary under the policy tendered back the check which had been given in payment of the disability benefit and brought this suit to recover the death benefit. The trial court gave judgment for the plaintiff. The Supreme Judicial Court of Massachusetts reversed this judgment, and said: "The intestate must be presumed to have read and understood the papers he signed. [Androscoggin] Bank v. Kimball, 10 Cush. 373; Grace v. Adams, 100 Mass. 505 [97 Am.Dec. 117, 1 Am.Rep. 131]; [Monitor Mut. Fire] Insurance Co. v. Buffum, 115 Mass. 343; Fonseca v. Steamship Co., 153 Mass. 553, 27

N.E. 665 [12 L.R.A. 340, 25 Am.St.Rep. 660]. By the receipt which the intestate gave he released and discharged the defendant of and from all claims and demands which he had against it under and by virtue of the certificate in question. We see no evidence of any fraud in the case. So far as the evidence shows, the intestate was, save for a little lameness, to all appearances, a well man, when he agreed to take his indemnity under the first certificate. This was on September 17th. A week before, his own physician, who had attended him for a month, was discharged. Fraud is not to be presumed, and the burden of proof is on the party who relies upon such a defense to allege and prove it. Beatty v. Fishel, 100 Mass. 448, 449; Hatch v. Bayley, 12 Cush. 27. In Nelson v. Railway Co., 61 Minn. 167, 63 N.W. 486, where a release of a claim for damages was signed by the plaintiff on the assurance of the defendant's physicians that her injuries were temporary, it was held that she could not avoid the release on the ground that the physicians were mistaken. The court said: 'There is not a particle of evidence tending to show that either of the physicians intentionally misrepresented the extent of the plaintiff's injuries, or that the statements made by them were not their honest opinions, according to their best professional judgment, based on existing symptoms.' In the case at bar there is no evidence of any false representations, or of wrong advice given in bad faith. The only ground on which the plaintiff seeks to show fraud is that Dr. West, on September 13th, gave

him bad advice in telling him that he was wrong to be staying about home, and not going to his business; and that Dr. West knew better, as he was a man of large experience. If we assume that Dr. West was mistaken, and that Wood's attending physician was mistaken, we find no evidence of fraud."

In the instant case, Moruzzi had the right, power, and authority to execute a release. He did execute such a release. That release was supported by ample consideration. It was not tinged with any fraud or undue influence. There was no legal mistake. The financial mistake was made by Moruzzi in accepting the money and signing the release. Yet he had a right to do so, and for aught we know wanted to do so. The parties dealt at arm's length. The release means what it says. Its validity is established, and it is binding on appellee.

■ It may be true that Moruzzi settled for a ridiculously small sum. We do not know whether he would have signed the release had he been aware of its consequences. The record is silent and it is not our place or duty to speculate the parties into a different contract than the one before us. Upon his own motion Moruzzi sought and obtained a settlement at the figure for which he settled. He had gone to the physician of his choice who had examined him and who diagnosed his injury to be just what it was. The fact that death subsequently followed was an unanticipated consequence of that injury; but there was

no mistake. The insurance company did not examine Moruzzi or have him examined by any physician, nor did they misrepresent to him in any way the character of the settlement he was making. He was not sought out or persuaded to settle for the insignificant sum for which he did settle. It was his own proposition. Assuming that the sum settled for seems inadequate, yet mere inadequacy of consideration in the absence of fraud, undue influence, overreaching, or mistake is no ground for relieving a party from the consequences of a contract which he had knowingly entered into. "Under the circumstances as here disclosed, where there has been no overreaching of one party by the other, there can be no relief on the ground of mistake. 2 Pomeroy, Equity Jurisprudence, § 855."

Appellee in her brief cites many authorities in an attempt to uphold her contention that the contract of insurance could not be released in so far as it affected her right as beneficiary. Her contention is that the contract of insurance contained a dual liability. One to Moruzzi for loss of time or losses specified in the policy other than death and to her as beneficiary in event of death. We do not read the contract of insurance to mean what appellee claims it does. The obligation of the contract is not dual but single, and the limit or maximum liability of the appellant is found in parts II and IV of the policy.

Under part II of the policy we find the provision wherein the appellant promises to pay for loss of life and certain other enumerated disabilities. In part IV of the policy we find the provisions wherein the appellant agrees to pay for certain disabilities. The indemnity promised under part IV begins with the conjunction "or." This latter promise is to that extent in the alternative, that is to say, the company promised to pay for certain disabilities, but if death resulted within ninety days (or other disabilities resulted as specified in part II), then the company would pay the amounts specified in part II in lieu of the payments specified in part IV, but not both. To the extent we have indicated the policy was in the alternative. Absent Moruzzi's release, the appellee might have collected. However, that question need not be decided.

Every case cited by appellee is distinguishable from the case at bar because we find in such cases the following elements not found in this case.

The following cases, Fidelity & Casualty Ins. Co. of New York v. Mountcastle, Tex. Civ.App., 200 S.W. 862; Continental Casualty Co. v. Bradbury, Tex.Civ.App., 259 S.W. 306; Moore v. Maryland Casualty Co., 150 N.C. 153, 63 S.E. 675, 24 L.R.A., N.S., 211; cited by appellee, and also the cases of Bolton v. Inter-Ocean Life & Casualty Co., 187 Mo.App. 167, 172 S.W. 1187; Wade v. Mutual Benefit Health & Accident Ass'n, 115 W.Va. 694, 177 S.E. 611; White v. Inter-Ocean Casualty Co., W.Va., 185 S.E. 203; Coulter v. Travelers' Protective Ass'n, 144 Ill.App. 255; Jones

56

v. Fidelity & Casualty Co. of New York., 166 Minn. 100, 207 N.W. 179, are cases where the amount paid the insured for the purported release was an obligation that was liquidated, matured, and undisputed.

In Woodmen Accident Ass'n v. Hamilton, 70 Neb. 24, 96 N.W. 989, 990, the form of release was different than the one we are considering. There, the insured gave the release in settlement "of all claims he had or might have" on account of the injury. The Nebraska court pointed out that future effects of the injury were not mentioned, saying: "It will be observed, too, that the language does not in express terms refer to any future damage or injury that might result from the accident."

The court also recognized the authority of Wood v. Massachusetts Mutual Accident Ass'n, 174 Mass. 217, 54 N.E. 541, and noted the obvious differences between the language of the releases involved.

The case of Pacific Mutual Life Ins. Co. v. McCabe, 157 Ky. 270, 162 S.W. 1136, cited by appellee was a death case where no release was involved. The contention was made by the insurance company that the simple payment to the insured for loss of time due to accident barred a subsequent recovery on account of his death. The court simply held that the provisions of the policy were not alternative but cumulative, and hence the payment of one benefit did not bar recovery for a different one.

Substantially the same situation existed in the Kentucky case of Fidelity & Casualty Co. v. Logan, 191 Ky. 92, 229 S.W. 104, cited by appellee.

Appellee contends in argument that though the consideration for the release may have supported a defense against any claim that Moruzzi himself may have made for additional compensation, yet the same consideration will not support a defense against her suit as the beneficiary. A consideration legally sufficient for any purpose at all is sufficient for whatever purpose the parties seek to use it. The relative values of a promise and the consideration for it do not affect the sufficiency of the consideration, and whatever consideration a promisor assents to as the price of his promise is legally sufficient. See 1 Restatement of the Law, Contracts, § 81.

The appellant at the request of the insured, made immediate payment before maturity of an unliquidated claim and waived its right to investigate and its right to require further proofs. The payment and forbearance furnished adequate consideration for whatever release Moruzzi cared to execute.

In the very recent case of Nixon-Foster Service Co. v. Morrow, 41 N.M. 67, 64 P. 2d 92, 95, we said: "The trend of modern decisions is toward a liberal construction of compromise agreements."

The check tendered to the insured carried a full printed release above the line intended for indorsement. True, the insured could not cash the check without signing the release. He was not necessarily im-

posed upon. He did not have to cash the check with the release thereon. Few compromises occur except in just such situations were a check is tendered for acceptance upon a condition. See Frazier v. Ray, 29 N.M. 121, 219 P. 492. A situation very similar to that of which appellee complains was approved by this court and, in fact, made the basis of our decision in the recent case of Miller v. Prince Street Elevator Co., 1937, 41 N.M. 330, 68 P.2d 663, 668. In that case we said: "When appellee, moved by a 'bird in the hand' policy, reached out and reclaimed the check, and certainly after a sufficient time for reflection when he wrote his name on the back of it, and took from defendant's account and appropriated to his own uses its amount, he swallowed the condition. It is now too late, and has been too late ever since he cashed the check, to back up. See Warren v. New York Life Ins. Co., 40 N. M. 253, 58 P.2d 1175."

As to appellee's argument that the release was not intended by the parties to cover liability for loss of life, we believe that the contract of insurance and the plain terms of the release refute that argument. This we have already demonstrated. The check showed exactly what it was given for. On its face the check recited that it was given in full and final compromise settlement of all claims against the company for any accidental injury or its effects originating prior to that date. The release appearing above the indorsement on the back of the check acknowledges receipt of the amount of the check "in full payment and compromise settlement, release and discharge, of any and all claims made or to be made as herein stated, and all liability of the company by reason of such injury or sickness or its or their effects, are hereby fully satisfied and discharged."

The release is plain and unambiguous. The language of the release shows that it was intended to cover all possible claims of every character arising out of the injury, including claim for death benefits. We cannot say that the parties did not mean what they said. As we have said before, it is not our duty to speculate the parties into a contract which they may not have intended.

For the reasons given, the judgment will be reversed, the cause remanded for proper disposition below.

It is so ordered.

HUDSPETH, C. J., and SADLER, and BRICE, JJ., concur.

BICKLEY, Justice.

I concur. In addition to the reasons given by Mr. Justice ZINN in support of his conclusion on the jurisdictional question, I desire to add that I adhere to the views suggested in State v. Armijo, 38 N. M. 73, 28 P.2d 511, that the word "interest" employed in the last phrase in section 18 of article 6 of the Constitution, to wit, "in which he has an interest," is broad enough to embrace bias and prejudice, and while pecuniary interest alone may afford evidence of bias or prejudice, the "interest" which disqualifies a judge under section 18

of article 6 may arise from other than pecuniary considerations. So viewing the matter, it appears that chapter 184, Laws 1933, provides the procedure for disqualifying a judge from trying a case "in which he has an interest" and is consistent therewith. In other words, when a party files an affidavit pursuant to chapter 184, Laws 1933, stating his belief that the judge cannot preside over the case with impartiality, he has in effect stated that the judge "has an interest" in the case. Therefore, section 15 of article 6, which provides that the parties to a cause, or their attorneys of record, may select some member of the bar to act as judge pro tempore therein, if the judge is disqualified from hearing the cause, is consistently operative.