## W. M. NEWMAN v. THE STATE.

### No. 407. Decided March 9, 1910.

**1.—Murder—Charge of Court—Defense of Home—Statutes Construed.**

Where, upon trial for murder, the defendant's testimony showed that the deceased (who was a stranger to defendant and his family) about midnight was approaching defendant's house where the defendant resided with his family, apparently armed with a pistol; and that some parties had been prowling about defendant's house that night apparently for some sinister purpose, the court should have given in charge to the jury as requested, article 675, Penal Code, under which defendant was justified in defending his home, and the court's charge that defendant had a right to shoot in defense of himself or any member of his family was too restricted and not sufficient, as defendant had the right to defend his home as well as himself and family.

**2.—Same—Evidence—Other Offenses.**

Upon trial for murder, it was reversible error to permit the State's witness to testify that defendant, long subsequent to the homicide, had been indicted for adultery with defendant's sister-in-law; there being nothing to indicate that the deceased approached the house to have carnal intercourse with said sister-in-law, or that they even knew each other.

Appeal from the District Court of Fannin. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*Hous Lee* and *Gross & Armstrong* and *B. B. Sturgeon,* for appellant.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, his punishment being assessed at seven years in the penitentiary. A substantial statement of the evidence discloses that appellant was a tamale vendor and lived in the town of

Ladonia with his family, consisting of his wife, a married daughter, a son-in-law, another daughter about grown, and some smaller children. The deceased, about twenty-two years of age, also resided in Ladonia. Appellant and the deceased were strangers to each other. The deceased was also a stranger to appellant's family. Appellant lived in one of a row of small tenant houses fronting west on the street. South of appellant's residence about seventy-five feet was a vacant house, fronting in the same direction on the same street as did the house in which appellant lived. Back of this row of houses, and at the extreme eastern limit of the yards of said houses, extending north and south up to the business houses, was a tall, solid plank fence. For the use of the people who resided in these four houses there were two wells situated on the line separating the premises of these houses. The occupants of two of the houses used water from one of the wells, and the occupants of the other two houses used water from the other well. From the west fence of the property, on the street extending north and south back of and between each of the houses to the high board fence on the east, there was extended a low picket fence which came to the wells. To each low fence were small gates in order that the occupants could go from one of the premises to the other. During the afternoon, preceding the night of the killing, there was quite a crowd of men and boys drinking beer from a keg. Among those who were in the vacant house was Cobb Richards, the deceased, and quite a lot of others. Appellant was not at home during the afternoon, nor did he see or know the crowd was at that vacant house drinking the beer. Appellant took supper at home and immediately, in company with his 12 year old son, returned to his place of business in town. He had his lantern and tamale wagon. When he returned to town he left at his residence his wife, married daughter and her husband, his single daughter, several smaller children and his wife's sister. Somewhere about 11 o'clock at night he returned, accompanied by his little boy, to his home from his business in town. His wife met him on the gallery and informed him there had been a crowd or several people around the house that night slipping about the house up to and peeping in at the windows, and would then disappear and in a short time return. She informed him that in every instance these parties would go to the north window of the room occupied by his married daughter and her husband. When he received this information he, accompanied by his little son and son-in-law, at the request of his wife, looked about the premises and on the outside and under the floor to ascertain if they could locate who were the intruders, but failed to do so. He went inside his house and soon thereafter one of his little boys called his attention to the fact that two men were coming towards the house in the back yard and from the vacant house just south of it. One of these parties went to the north window where appellant's daughter and her husband were in bed, and approaching the wall as close as he could, the intruder would

peep in and jump back. He did this several times and disappeared. Appellant had his married daughter and the rest of the children to get off their beds and lie down on the floor, so that if the intruders shot into the house they would not be liable to be hit, and kept them in that position. About an hour after the above mentioned party had gone from the window where appellant's daughter and son-in-law were sleeping, he returned from the vacant house; appellant saw him coming and went from the room in which he was into the kitchen. As he went in the kitchen he had all the lights in the house extinguished, and in going he ran against a chair and made a noise. At this juncture the party on the outside of the house stopped in front of the window, threw up his hand with something in it that appellant thought to be a pistol. Appellant fired through the window and the party fell and died. This proved to be the deceased, a young man named Richards. Appellant at once sent for an officer. Prior to the shooting he tried to get some member of his family to go for an officer, but they were all excited and crying and afraid to go. Appellant's evidence is to the effect that at the time he fired the party was approaching the house, armed with a pistol, and to use the expression of the witnesses, "slipping along up to the house." The State's contention was that deceased was not armed at the time. These matters were issues raised by the testimony. Appellant's evidence further shows that immediately after the shot was fired the deceased called for someone whom he called Squee. The witnesses all agree that the deceased made a call but differ as to the language used or as they understood the language. Appellant's testimony is further to the effect that a party approached the body of the deceased, took the pistol and went away with it. Deceased was shot in the left side.

1. The court charged the jury that if appellant fired the shot in defense of himself or any member of his family the jury should acquit. He also charged the jury that if appellant believed the party was approaching the house for the purpose of shooting himself or any member of his family he would be justified in shooting. In other words, the court's charge limited the right of appellant to fire to the question in regard to the defense of his own person or some member of his family or inmate of his family. Exception was reserved to the omission of the court to charge the jury with reference to the defense of his habitation, and to give in charge the provisions of article 675 in regard to justifiable homicide. To meet this omission in regard to the court's charge, appellant requested instructions which were refused. The court's charge was erroneous in failing to charge the provisions of article 675. This error was intensified by the refusal to give the requested instruction. Article 675 of the Penal Code reads as follows: "Homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, rape, robbery, maiming, disfiguring, castration, arson, burglary and theft at night, or when inflicted upon a person or persons who are found armed with deadly

weapons and in disguise in the night-time on premises not his or their own, whether the homicide be committed by the party about to be injured or by some person in his behalf, when the killing takes place under the following circumstances: 1. It must reasonably appear by the acts or by words, coupled with the acts of the person killed, that it was the purpose and intent of such person to commit one of the offenses above named. 2. The killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense." There are other sections of this article which it is not deemed necessary to quote, although they might be germane in evidencing the intention of the Legislature in their enactment. The evidence does not clearly indicate the purpose of the deceased in approaching appellant's residence, but he and another, or as the witnesses supposed it was deceased and another, had come to the window of one of the rooms where a bed was situated occupied by appellant's married daughter and her husband several times during appellant's absence. It may be well enough to state that prior to his return appellant's son-in-law had gone out in the yard to ascertain who the parties were but they ran away. At least he failed to find them. Under the testimony adduced by the appellant and his family the deceased was approaching the house for some purpose armed with a pistol. He did not fire into the house. The purpose then in the mind of the deceased may have been other than that of an intent to kill. The definite purpose of the deceased is not manifested by the record. It is not claimed that he was insane and therefore without a purpose, but even if that were true, appellant was not aware of it, for they were strangers. The record, viewed from the standpoint of the evidence, suggested that the different phases of the law embodied in article 675, supra, should have been given. If deceased approached the house for any of the purposes set forth in said article, appellant was justified in shooting. He had the legal right to defend his home as well as the inmates of that home under the terms of said article, whether the party intended to shoot, commit theft, burglary, or rape. In the case of Richardson v. State, 7 Texas Crim. App., 486, Judge White, then Presiding Judge of the court, said: "And again, upon the two main features of the defense, viz., self-defense and justifiable homicide in defense of one's habitation, the law is more favorable to the accused than as it is found enunciated in the charge. There is no positive rule for the definition of justifiable homicide. It must depend upon the circumstances and surroundings of each particular case, and a mere declaration or enunciation of the rules prescribed in the statute will in many instances fall short of filling the measure of the law as it has been interpreted and thoroughly established by precedents and authority of long and recognized standing. A defendant is always justifiable in acting for his defense, or the defense of his family or property, according to the circumstances as they rea-

sonably appear to him, and it is but just and right that his action should be judged of in the light of the circumstances as they appeared to him at the time. Such is our understanding of the law, and such the rule of decision in this State. It is not necessary that there should have been actual danger, provided the party acted on a reasonable apprehension of danger. Munden v. The State, 37 Texas, 353; Horbach v. The State, 43 Texas, 242; Cheek v. The State, 4 Texas Crim. App., 444; Blake v. The State, 3 Texas Crim. App., 581; May v. The State, 6 Texas Crim. App., 191; Marnoch v. The State, decided at the present term, ante, p. 269. Defense of one's habitation is a right only limited in extent by the same rules which govern in the defense of the person. If we recur to the common law, we will find that even there a party committing homicide while defending his dwelling-house against an assault, actual and positive, was held guilty of no higher grade of homicide than manslaughter. 1 Hale's P. C., 485, 486; East's P. C., 287, 321; Hawk. P. C., 83. In Mead's case, 1 Lew. C. C., 184, Holroyd, J., said that 'a civil trespass will not excuse the firing of a pistol at a trespasser in sudden resentment or in anger. If a person takes forcible possession of another's close, so as to be guilty of a breach of the peace, it is more than a trespass. So if a man with force invades and enters the dwelling of another. . . . But the making of an attack upon a man's dwelling, and especially in the night, the law regards as equivalent to an assault upon a man's person; for a man's house is his castle, and therefore in the eye of the law it is equivalent to an assault." Further, in the same opinion quoting from Carroll v. The State, 23 Alabama, 28, this language is used: "It is conceded most fully that if the evidence shows an assault upon the house or the person, under circumstances which would create a reasonable apprehension, that is, a just apprehension in the mind of a reasonable man of the design to commit a felony with force, or to inflict a personal injury which might result in loss of life or great bodily harm, the danger of the design being carried into execution being imminent and present, the person in whose mind such an apprehension is induced, or over whose person or property such an apprehension is impending, may lawfully act upon appearances and kill the assailant. The law would not in such a case require that the danger should be real, that the peril should actually exist, but it does require that the appearances shall be such as would excite a reasonable apprehension of such peril; and if such appearances do not exist the killing would be either murder or manslaughter." The doctrine laid down in the case from which these extracts are made has been approved in all subsequent cases in this State where the question has arisen. In Laws v. State, 26 Texas Crim. App., 643, the doctrine was applied directly in a case of theft at night. The Laws case was followed by Whitten v. State, in the 29 Texas Crim. App., 504. And in fact the statute itself justifies the homicide when the evidence would suggest that the deceased was approaching the house with a

view of committing any of the offenses named in article 675. The particular purpose of the deceased not being manifest, the charge should be broad enough to cover any view that might be taken of the testimony by the party committing the homicide. These transactions all occurred along about midnight. The purpose of the party approaching the house is not disclosed. Appellant's son-in-law had sought to ascertain who they were. They disappeared. . Appellant, coming home and being informed of the action of the parties, in company with his son-in-law and little son, also investigated the matter to ascertain why the parties were prowling around his house at that time of night. They had come from a house a few feet away where a crowd of people had assembled and consumed a keg of beer. Appellant had in no way disturbed them, nor had his family. They were strangers to him, and under the circumstances it left it evidently a matter of conjecture to a large extent as to what was the object and purpose of the midnight prowlers. These strangers had no right on the premises of the appellant at that time of night, and certainly appellant would be justified in believing that there was some serious purpose on the part of the deceased as evidenced by the circumstances as they presented themselves to his, appellant's, mind. The court's charge was too restrictive in limiting appellant's legal rights to the mere question of the defense of his person or the persons of his family. The court was correct in giving this phase of the law, but the charge should have gone further and submitted the law of justifiable homicide in the defense of his home or his family against any unlawful purpose on the part of the deceased that might have actuated his mind in firing the fatal shot. Cases of this sort are viewed from the defendant's standpoint and he is entitled to the presentation of the law to the jury on any phase of justifiable homicide that might be drawn, as presented by the facts or any inference that might be deduced from the facts. There was no question of the fact that the deceased was at the point indicated, because his body was found there and carried away. Because of the omission in the court's charge and the refusal to give the special instructions requested by appellant this judgment must and will be reversed.

2. The court over appellant's objection permitted the witnesses to testify that appellant, long subsequent to this homicide, had been indicted for adultery with his sister-in-law. This was error. The act of the grand jury in indicting appellant and his sister-in-law can not be used as evidence against the appellant. We do not think this question debatable. In this connection it might be well enough to state a phase of the testimony not before mentioned. The sister-in-law of appellant, at the time of the trial, was the mother of two illegitimate children, one of whom was born in the State of Arkansas. Subsequent to the birth of this child she came to Texas and lived with appellant and her sister, appellant's wife. At the time of the homicide she was pregnant, and since the homicide had given birth to a child. When

appellant discovered the fact of her pregnancy, he told his wife that her sister must leave his home; that he could not afford to have her in his house with his daughters and children. The wife plead for her sister, stating, in substance, that if they drove her away from their home she had none to which she could go, and that she would then become an outcast and without protection and without a home, and persuaded her husband to let her sister remain under his roof. This matter got into the trial of the case perhaps for the purpose of impressing the jury with the fact that appellant was the paramour of his sister-in-law, and that it was on this account and for this reason that he slew the deceased, who may have been approaching the house for the purpose of meeting appellant's sister-in-law, and that it was on account of jealousy that he killed deceased. It may be stated, however, at this point, that there was nothing to indicate that deceased had ever known or met appellant's sister-in-law, and the inference from the testimony is strongly indicative of the fact that the deceased and appellant's sister-in-law did not know each other, and there was no reason why he could hope to have intercourse with her. The court in signing the bill of exceptions with reference to the introduction of the testimony in regard to the finding of the bill of indictment for adultery against appellant, stated that upon the theory that having proved the fact that the sister-in-law of appellant had two children of illegitimate birth, that therefore it was legitimate to prove that the grand jury had indicted appellant and the woman. In this the court was in error. It was but the opinion of the grand jury in regard to the matter from which it was not deducible that appellant killed on account of jealousy.

3. There are other questions suggested for revision which we deem unnecessary to discuss. In regard to the matter of continuance the absent witnesses may or can be obtained upon another trial. And in regard to the other criticisms of the charge, what we have said above we think sufficiently presents these questions for the consideration of the trial court in charging the jury. The other criticisms of the charge are on kindred lines to the one already discussed.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*