TRIXIE RUSSELL, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

A person's dwelling house is a castle of defense for himself and those rightfully in his house, and when another attacks or invades one's dwelling in a threatening manner under such circumstances that the owner has reason to believe and does believe that he is in danger of losing his life or suffering great bodily harm, he is not obliged to retreat, but may stand his ground and meet any attack made upon him with such force as under all the circumstances he has reason to believe and does believe is necessary to save his life or protect himself from great bodily harm, and this rule is applicable to all persons without regard to their moral conduct in other respects.

This case was decided by Division B.

Writ of error to the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*A. G. Hartridge,* for Plaintiff in Error;

*Park Trammell,* Attorney General, for the State.

HOCKER, J.—In January, 1910, in the circuit court of Duval county, Trixie Russell, the plaintiff in error, was indicted for the murder of one William Carter, on the 25th day of December, 1909. She was tried in February, 1910, convicted of manslaughter and sentenced to the penitentiary for the term of four years. She seeks here on writ of error to reverse this judgment.

The only errors assigned here are based on the rulings of the trial court refusing to give certain requested instructions to the jury, to each of which rulings an exception was properly noted. There are five of these instructions, but they all bear upon the right of self-defense by one who is assaulted in his own dwelling house. The first and third of these requested instructions are as follows:

"1. A person's dwelling house is a castle of defense for himself and his family, and an assault upon it with intent to injure such person or any of them, may be met in the same way as an assault upon himself or any of them, and she may meet the assailant at the threshold and use the force necessary for her or their protection against the threatened invasion and harm.

3. The court instructs the jury that if, while one is lawfully on her own premises, another advances in a threatening manner and under such circumstances that the former believes and has reason to believe that she is in danger of losing her life or of suffering great bodily harm, she is not obliged to retreat but may stand her ground and meet any attack made upon her in such a way and with

such force as under all the circumstances she at the moment believes and has reason to believe is necessary to save her life or protect herself from great bodily harm."

The general charge of the trial judge is eminently correct and fair to the defendant as far as it extends, though it does not cover fully the first paragraph of section 3203 General Statutes of 1906, defining justifiable homicide. That paragraph is as follows: "When resisting any attempt to murder such person, or to commit any felony upon him or her, *or upon or in any dwelling house in which such person shall be.*" There is no reference anywhere in the charge to the law regulating the right of self defense when made in one's own dwelling house.

This court in the case of Wilson v. State, 30 Fla., 234, 11 South. Rep., 556, stated the law on this subject in the following terms: "a person's dwelling house is a castle of defense for himself and his family, and an assault upon it with intent to injure him or any of them may be met in the same way as an assault upon himself or any of them, and he may meet the assailant at the threshold and use the force necessary for his or their protection against the threatened invasion and harm." In 1 Bishop's Crim. Law, section 858, it is said: "In the early times our forefathers were compelled to protect themselves in their habitations by converting them into holds of defense; and so the dwelling house was called a castle. To this condition of things the law has conformed, resulting in the familiar doctrine that while a man keeps the doors of his house closed, no other may break and enter it, except in particular circumstances to make an arrest or the like—cases not within the line of our present expositions. From this doctrine is derived another, namely, that the persons within the house may exercise all needful force to keep aggressors out, even to the taking of life. As observed by CAMP-BELL J., in Michigan, a man is not obliged to retreat if as-

saulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house, or to prevent his forcible entry, even to the taking of life." Again in section 859, ibid. it is said: "One attacked in his home need not retreat, and he may use all necessary force to eject the intruder, whom he may kill in doing it, if this extreme measure appears unavoidable." It seems to be clear, however, that one assaulted in his dwelling house would not be justified in killing the aggressor, unless he had reasonable ground to believe, and did believe, that unless he killed the aggressor a felony would be committed upon him or her, or upon or in the slayer's dwelling. The general law on this subject is given in the case of State v. Patterson, 45 Vt., 308, and in the note to that case in 12 American Reports pp. 200-212. See also 25 Cyc., p. 277, where the law relating to the defense of one's habitation (the curtilage) is fully stated.

We will now examine the evidence to see whether the refused instructions were applicable thereto. Trixie Russel admits she was a prostitute. She lived at No.        on Ward street, in the city of Jacksonville, in a house rented by her. She shot William Carter in the hall of her own house with a pistol about 2 o'clock in the morning of the 25th of December, 1909.

A Mr. Baxley testified for the State that he was on Ward street between Jefferson and Bridge Street about half past one or two o'clock on the morning of the 25th of December, 1909; that when he arrived opposite Trixie Russell's house, the door was open; that he saw three people standing in the hall, one woman and two men. He went up the steps to the door and saw the woman shoot three times. He then went back to the sidewalk. The two men came out of the house and the one that was shot sat down on the edge of the porch, and said "I'm a dead man." He identified Trixie Russell as the woman who did the

shooting. There was a door from the narrow hall into Trixie Russell's room. She was standing just out of this door in the hall—between witness and Carter, the man who was shot. While witness and a friend were standing on the corner of Jefferson street two people went across on the opposite side of the street. Witness did not see Carter doing anything, as he was shot as witness got to the door. He did not see either of the parties move after he got to the door. Carter was standing about three feet from Trixie, his hands were down, and witness did not see him attempt to strike her. He saw no brick in Carter's hands. It was fifteen or twenty seconds from the time witness got in view of the door, walked up in the door and Trixie shot just as he got to the door. The hall was about three and a half feet wide. One man was standing in the hall between witness and Carter.

The State's next witness was Frank Davenport. He was at Trixie Russell's house on the morning of the 25th of December, 1909, when Mr. Carter came there. He says that he was standing in the door talking to Trix Russell when Carter and his friend came up on the porch, and they went to the door next to the one where he and Trixie were and they made a lot of racket rapping on the door, and the woman in that room came to the door, and told him to go away—told him "if you don't I'll get something and blow your brains out," and slammed the door in his face. He (presumably) Carter then walked up to where witness and Trixie were standing talking and walked right in—Trixie told him to go out, he did not go, and told her he had as much right there as anybody. So Trixie "walks on in her bed room and gets a gun and shoots him." The house in which Trixie lived was a double house—two doors—about ten feet apart. When Carter came to the house witness was inside of the door, against the facing. She was leaning against the other door facing.

Carter was not acting in a boisterous manner, just refused to go out. The door was open when Carter came up on the porch. Carter got ten or fifteen feet inside the door, just past her bed room. Carter was standing up talking to Trixie when he was shot. He had no weapons—had no brick. Witness told Carter "If I were him, I would get out." Carter said "you can't put me out, nor nobody else." Witness says that when Trixie came out of her bed room with the pistol she said to Carter "you are not going to get out?" Carter said he was not going. He was about two feet from her and did not raise his hand—standing with his hands down when he was shot. Carter was not drunk and witness was not drunk but had had several drinks of whiskey. Witness was asked if a certain man was Carter's friend and answered if he was there witness did not see him—did not think he was the man with Carter. Witness was not a friend of Carter—did not know anything about him. Witness did not hear Trixie Russell call her servant and tell her to go and get a policeman. Witness walked right out of the house when the shooting occurred. Witness did not know whether Mr. Baxley was standing outside of the door. He did not see the black servant woman—did not see her trying to get out of the front door. He told Carter to get out because the latter did not realize the danger. Did not tell him to get out before he saw the pistol in Trixie Russell's hands. At the time of the shooting there were three men in the hall including witness.

D. S. Walker, city sergeant, testified that Trixie Russell told him she shot Carter because he pulled her hair and struck her in the face with a brick.

Trixie Russell testified in substance that on Christmas Eve night about a quarter of eleven o'clock two fellows came to her door and asked to let them in. She saw they were drinking, told them they would have to come back some other night. She did not open the door. They tried to

knock the door down—beat on the glass, and cursed her terribly and called her bad names. She then went in and laid down on her bed. After twelve o'clock the same two fellows came back and asked to be let in. She told them they could not come in. While she was talking a "gentleman" came up that she knew, and she opened the door to let him in. They pushed beside her and walked in. The other man saw there was going to be trouble and went on down the hall and out the back way. They asked her why she let the son-of-a-bitch in and did not let them in. She made some excuse. She was standing in the middle of the corridor (in hall). Carter came past her, and his friend was at the front door backed up against it, so that she could not get out either way. Carter was cursing and calling her all sorts of names. He had a brick in his hand —and describes that he was holding it in a certain way— she called Susie, her night maid, and they grabbed her in the hall and would not let her pass, and went to hitting at her. She ran to her room. She could not get out of the hall or through the window. She went to get the gun. Carter grabbed at her, scraped her face, pulled her hair, and she shot him. She says Carter said he was going to kill her for not letting him in before. She says he was drunk. She did not see Baxley there that night. She saw Davenport there, but he was not in the house. She had never seen Carter before that night. She shot Carter in her home—her rented house. A doorway opened from the narrow hall into her bed room. She shot Carter because she was afraid he would do her bodily harm. She was at the time in a delicate state of health. She did not see either Baxley or Davenport that night. A girl named Evelyn Gonzalez was sleeping in a room adjoining that of witness. She was standing at the door talking to another man when Carter and the fellow who was with him pushed into the hall. She told Susie, the maid, to go for a policeman,

and Carter and the man·who was with him prevented her from going.  There was a pole on brackets over the door of witness's room on which was suspended a curtain. Carter broke it.  Susie Benjamin, the colored maid, testified in behalf of the defendant at considerable length. She was in the back room when Carter came in. Trixie called her to go for an officer.  She started to go, but got no farther than the door as they pushed her back.  It seems to her that the man struck defendant on the side of the face with a brick—anyhow her face was bruised.

Police officer, Lee Harrell, testified that Baxley told him he Baxley was standing across the street and that there was no one in the house that saw the shooting.

Willis Jones, a police officer, testified for defendant that he had seen Carter that night before the shooting. Saw him at Evelyn Simpson's—there was a crowd in there fussing. Evelyn called him in and he found a crowd fussing or fighting and drinking. Carter was in the crowd. He scattered the crowd. He again saw Carter, took him away from the Spanish DeSoto. He and two other fellows were trying to break in. The woman on the inside was trying to keep him out.  The officer carried them away from there and told them if he saw them again he would send them in.  He did not put them in before, as he had orders to be lenient on Christmas night. He believed Carter had been drinking, he acted that way.  He was rough and boisterous. Evelyn Simpson testified for defendant. She ran a house at 714 Ward street. There was rough crowd at her house Christmas night and she called officer Jones to put them out.  One of them had a pistol. She did not know Carter. Pauline Hall testified for the State. She lives at 736 Ward street. She knew William Carter. She saw him at her house Christmas Eve night about 12 o'clock. He seemed to be sober.  Witness said she was a fast woman.

The foregoing is a synopsis of the principal features of

the evidence. It is evident that the bacchanals were out in force on Ward street that Christmas Eve night, and that the police were giving them a pretty free hand. There was a plenty of drinking, cursing and rowdyism of one kind and another.

In determining upon the propriety of requested instructions the testimony of Trixie cannot be disregarded. It is not disputed that she refused to permit Carter to come into her house; that he pushed himself into the hall; that she ordered him out, and that he refused to go. She says that Carter pulled her hair, scratched her face and struck at her with a brick; that he and the man with him would not permit the maid Susie to go for the officer, that she could not escape from the house by door or window and that she shot Carter because she apprehended bodily harm from him. She was in her own house—her castle of defense —where she had a right to be. Carter had no right to be in her house without her consent. He unquestionably was an intruder, a trespasser, under the influence of liquor. We think that the defendant had a right to have the case submitted to the jury under this aspect of the testimony, in appropriate charges, and we think that the two refused instructions hereinbefore set out, were appropriate and should have been given. The other three requested instructions are objectionable for one or another reason.

The judgment is reversed, and a new trial awarded.

TAYLOR and PARKHILL, J. J. concur;

WHITFIELD, C. J., and SHACKLEFORD and COCKRELL, J. J., concur in the opinion.