193 P.2d 405

### STATE v. COUCH.
### No. 4946.

Supreme Court of New Mexico.
Dec. 31, 1946.

On Rehearing May 20, 1948.

Caswell S. Neal, of Carlsbad, and C. Melvin Neal, of Hobbs, for appellant.

C. C. McCulloh, Atty. Gen., and Thos. C. McCarty, Asst. Atty. Gen., for appellees.

George L. Reese, Jr., Sp. Asst. Atty. Gen., for appellee, on·rehearing.

HUDSPETH, Justice.

Appellant was convicted by a jury of the crime of voluntary manslaughter and

sentenced to the penitentiary for a term of not less than seven nor more than ten years, from which he prosecutes this appeal.

The appellant and his wife resided in a small cottage, the property of appellant, surrounded by vacant lots, situate in Hobbs, Lea County, at the time and prior to the commission of the homicide. Appellant had complained to the police that during the absence of himself and wife parties had repeatedly entered his cottage for the purpose of copulating; that he had put additional locks on the doors of the cottage; and shortly thereafter on June 24, 1945, and June 27, 1945, in the nighttime, parties had driven by his cottage in automobiles and thrown rocks, some of them the size of a man's fist, against his house, and injured the building. The third attack was made on the residence of appellant about midnight June 30th, 1945. On that occasion immediately after two rocks struck the house, appellant fired two shots from a shotgun, through windows of his house, which caused the death of Charles Vaughan and the destruction of one eye of Robert Langford, who had previously lost the other eye while hunting. These boys were both sixteen years of age and approximately five feet and eleven inches tall. The deceased weighed about 150 pounds. They and another boy were riding on the running boards of the automobile, which was traveling at a slow speed. Other rocks were found in the car—and one of the three boys riding on the running boards testified he had not thrown the rock held in his hand when the shot struck him. There were no street lights in the vicinity of the cottage, although a gas torch at an oil well a mile away gave some light at times.

Appellant, a machinist, who had been promoted to foreman of the shop where he was employed, discussed with his boss the matter of the intrusions into his home, which had greatly disturbed his wife. The boss suggested that the intruder might be someone dissatisfied with his advancement to the foremanship, and advised him to wait before he did anything.

After the house was "rocked" on the night of June 27th, which occurred between 12:00 and 1:00 o'clock, appellant called the police and two officers immediately responded. They saw the rocks and the scars on the pine siding of the walls, and heard a full report of the previous occurrences, including the intrusions and the evidence left by the intruders in appellant's cottage. Appellant inquired of the Chief of Police the following Thursday evening as to developments in the case and was advised that nothing had been learned as to the identity of the parties. On the following Saturday night the killing occurred.

The state's witnesses testified to the three assaults on the house, and that the

shots were fired immediately after the two rocks struck the house on Saturday night.

Appellant and his wife testified that they attributed the assaults on the house to their unknown enemy, who had entered their cottage during their absence. Appellant testified, in part, as follows:

"A. Our bed room, our bed set right in front of two West windows and we kept those two windows down and the shades pulled at all times, and the South window the one on the West corner next to our heads we kept it down all the way, and on the East side of the double window, the window farthest away from the bed, we kept it up four, five or six inches just for a little air to come through.

"Q. How long had you done that? A. Since shortly after we noticed the house being entered.

"Q. Why did you do that? A. I did not know who was coming in and prowling around, and we were afraid to lay there with the windows open.

"Q. Did you have the house air conditioned? A. No, sir.

"Q. You did that all through the summer? A. Yes, sir.

"Q. Had you and your wife discussed whether or not what had been her attitude about what you ought to do? A. She wanted to leave and move away from Hobbs, as she said she could not stand it

any longer, and I said I had worked hard on the job I had and hated to just pick up and run off and leave it. We had worked hard to get our place fixed up as nice as it was.

"Q. Did you have any idea who might be causing this trouble? A. No, sir."

Appellant's assignment of errors are based upon alleged errors in instructions of the court to the jury and the refusal of requested instructions.

In addition to the defense of habitation, appellant relies upon 1941 Comp. Sec. 41-4712 (Laws 1891, Chap. 65, Sec. 1), which declares to be a felony the unlawful and malicious destruction or injury of a building on the land of another, and 1941 Comp. Sec. 41-2413, which follows:

"Killing in defense of person or property, apprehending felon, suppressing riot, or preserving peace.—Such homicide is also justifiable when committed by any person in either of the following cases:

"First. When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling-house in which such person shall be.

"Second. When committed in the lawful defense of such person, or of his or her husband, wife, parent, brother, child, master, mistress, or servant, when there shall be reasonable ground to apprehend a de-

sign to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished; and

"Third. When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed; or lawfully suppressing any riot; or in lawfully keeping and preserving the peace. (Laws 1853–1854, p. 86; C.L. 1865, ch. 51, § 5; C.L. 1884, § 692; C.L. 1897, § 1069; Code 1915, § 1471; C.S. 1929, § 35–318.)"

Appellant assigns error based on the use by the court in its instruction on justifiable homicide of words of limitation on the right of appellant to kill.

After quoting the first paragraph of Section 41-2413, appellant's counsel maintain: "This statute gives a man the right to kill another who is committing a felony upon his home, he being therein. No qualification upon the right exists. If a felony is being attempted or committed and the violator is killed while engaged therein, the killing is justifiable. No limitation upon the degree of force used is material. No actual necessity or apparent necessity to kill to prevent it is necessary. If the killing occurs while such a felony is in progress, the legislature has said it is justifiable."

It is argued that since paragraphs 2 and 3 of this section contain qualifying limitations on the right to kill that the legislature intended there should be no limitation when one was resisting an attempt to commit the crimes listed in the first paragraph.

The Attorney General suggests that a later statute, 1941 Comp. Sec. 41-2411 (Laws of 1907, Chap. 36, Sec. 11) modifies the first paragraph of Section 41-2413, which reads as follows: "41-2411. Justifiable homicide—Defense of self, family, or property.—Any person who shall kill another in the necessary defense of his life, his family or his property, or in legal defense of any illegal proceedings against himself, his wife or family, shall be adjudged not guilty. (Laws 1907, ch. 36, § 11; Code 1915, § 1469; C.S. 1929, § 35-316.)"

This section is part of an act of twenty-three sections defining murder and other crimes and repealing, by number, fifteen sections of the Compiled Laws of 1897 and "all other acts and parts of acts in conflict herewith." Laws 1907, c. 36, § 23.

The Territorial court in the case of Territory v. Matson, 16 N.M. 135, 113 P. 816, 819, held that the words "All acts and parts of acts in conflict herewith" added nothing to the repealing effect of the later legislation.

We lately considered the subject of repeals by implication in the case of Levers v. Houston, 49 N.M. 169, 159 P.2d 761;

and State v. Melendrez, 49 N.M. 181, 159 P.2d 768, where there appear discussions of the subject.

In the earlier case of State ex rel. County Com'rs, San Miguel County v. Romero, 19 N.M. 1, 140 P. 1069, we held: "Syl. A subsequent statute, treating a subject in general terms, will not be held to repeal by implication an earlier statute, treating the same subject specifically, unless such construction is absolutely necessary in order to give the subsequent statute effect."

In the late case of Robinson v. United States, 8 Cir., 142 F.2d 431, 432, the following language is quoted with approval from United States v. Zenith Radio Corp., D.C.Ill., 12 F.2d 614: " 'It is elementary that where there is, in an act, a specific provision relating to a particular subject, that provision must govern in respect to the subject as against general provisions in the act, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates. Endlich, Interpretation of Statutes, § 216; Swiss National Insurance Co. v. Miller, 53 App.D.C. 173, 289 F. 571, 576; Washington v. Miller, 235 U.S. 422, 428, 35 S.Ct. 119, 59 L.Ed. 295; United States v. Nix, 189 U.S. 199, 205, 23 S.Ct. 495, 47 L.Ed. 775; Townsend v. Little, 109 U.S. 504, 519, 3 S.Ct. 357, 27 L.Ed. 1012. This rule is particularly applicable to criminal statutes in which the specific provisions relating to particular subjects carry smaller penalties than the general provision.' "

■ The older statute is more specific, particularly as to resisting an attempt to commit a crime; and we do not deem it repealed by Section 41-2411 and only modified or qualified to the extent that the word "necessary" appearing in the later statute should be given effect.

Other courts have interpreted the language of the first paragraph, Section 41-2413, quoted above, as if the word "necessary" appeared in the statute. See Collegenia v. State, 9 Okl.Cr. 425, 132 P. 375, and Viliborghi v. State, 45 Ariz. 275, 43 P.2d 210.

In Russell v. State, 61 Fla. 50, 54 So. 360, 361, the court said:

"The general charge of the trial judge is eminently correct and fair to the defendant as far as it extends, though it does not cover fully the first paragraph of section 3203, Gen.St.1906 [F.S.A. § 782.02], defining justifiable homicide. That paragraph is as follows: 'When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person shall be.' * *. *

"It seems to be clear, however, that one assaulted in his dwelling house would not be justified in killing the aggressor, unless he

had reasonable ground to believe, and did believe, that unless he killed the aggressor a felony would be committed upon him or her, or upon or in the slayer's dwelling. The general law on this subject is given in the case of State v. Patterson, 45 Vt. 308, and in the note to that case in 12 Am.Rep. 200–212."

Another case involving a similar statute is that of Bowen v. State, 164 Miss. 225, 144 So. 230, 232, in which the court, after quoting from 30 C.J., Section 264, page 84; 40 C.J.S., Homicide, § 109, said:

"Our own statutes provide such justification in clause e of section 988, Code of 1930, wherein it is provided that the killing of a human being shall be justifiable. '(e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling-house in which such person shall be.' * * * Her testimony as to what happened, and how it happened, warranted her in resorting to the shotgun as a means of ejecting the deceased, and as a means of protecting herself and her home from violation.

"The home is one of the most important institutions of the state, and has ever been regarded as a place where a person has a right to stand his ground and repel, force by force, to the extent necessary for its protection. In early English law, it was a man's castle to which he might retire and defy the whole world. Officers could not enter, but must wait outside to even serve processes of arrest upon the occupant of the house. A great English statesman in an outburst of oratory has declared that a man's home is his castle wherein the King could not enter against the owner's consent; that the winds might enter, the rain might enter, but the King and his officers could not enter it; and that, no matter if the home was so poor as to be insufficient to exclude the elements, it remained a man's stronghold."

The Supreme Court of Missouri in State v. Taylor, 143 Mo. 150, 44 S.W. 785, 788, interpreted a similar statute and said:

"That 'one's dwelling house is his castle' is a maxim of the common law. This was ruled in Semayne's Case, 5 Coke['s Rep.] 91 A.: 'The house of every one is his castle, and if thieves come to a man's house to rob or murder, and the owner or his servants kill any of the thieves in defense of himself and his house, it is no felony, and he shall lose nothing.' 3 [Thos.] Coke['s Rep.], 188. The principle is of feudal origin, and essentially necessary in the early history of England, when men were compelled to defend themselves in their homes, by converting them into fortified castles. It will be observed that in Semayne's Case the right to kill was limited to the resistance of the commission of a felony. It is insisted by defendant that at

common law one was justifiable in killing a mere trespasser upon his dwelling house. We do not so understand the sages of the law.

"Thus, Lord Hale, in his Pleas of the Crown, (1 Hale, P.C. [484]), says: 'I come to consider what the offense is in killing him that takes goods or doth injury to the house or possession of another. And herein there will be many diversities as, first, between a trespassable act and a felonious act, and between felonious acts themselves.' * * *

"Let us inquire as to our own country. Dr. Wharton, in his work on the Law of Homicide, in section 541, under the head of 'Protection of Dwelling House,' says: 'When a person is attacked in his own house, he need retreat no further. Here he stands at bay, and may turn on and kill his assailant if this be apparently necessary to save his own life; nor is he bound to escape from his house in order to avoid his assailant.' 'In this sense, and in this sense alone, are we to understand the maxim that "every man's house is his castle."' 'An assailed person, so we may paraphrase the maxim, is not bound to retreat out of his house to avoid violence, even though a retreat may be safely made. But he is not entitled, either in the one case or the other, to kill his assailant unless he honestly and nonnegligently believes that he is in danger of his life from the assault,' or when a felonious assault is being made upon the house, as to commit burglary, arson, or other felony therein or against its inmates. This statement of the law is abundantly sustained by Archb.Cr. Law, p. 221, and the authorities there cited; Reg v. Bull, 9 Car. & P. 22. See, also, People v. Walsh, 43 Cal. 447; Carroll v. State, 23 Ala. 28, [58 Am.Dec. 282]; De Forest v. State, 21 Ind. 23; State v. Patterson, 45 Vt. 308; Morgan v. Durfee, 69 Mo. 469, [33 Am.Rep. 508].

"It may as well be noted that, if the aggressor is about to commit a felony, it is wholly immaterial whether it is a felony at common law or by statute. In either case the owner of the house may protect himself or his house from the perpetration of a felony against either, without retreating therefrom. Davis, Crim.Law, p. 156. The foregoing view of the law has been adopted by the general assembly of this state in defining justifiable homicide. State v. O'Connor, 31 Mo. 389. Section 3462, Rev.St. 1889, provides that: 'Homicide shall be deemed justifiable when committed by any person in either of the following cases: First, in resisting any attempt to murder such person or to commit any felony upon him or her or in any dwelling house in which such person shall be,' etc.

"We have thus gone at length into a review of the law upon this subject, and we deduce from the decided cases and the standard authors that a mere civil tres. pass upon a man's dwelling house does not

justify him in slaying the trespasser; that the owner may resist the trespass, opposing force against force, but he has no right to kill unless it becomes necessary to prevent a felonious destruction of his property or the commission of a felony therein, or to defend himself against a felonious assault against his life or person; that if he kills without reasonable apprehension of immediate danger to his person or property, but in the heat of passion aroused by the trespasser, it will be manslaughter. * * *"

In Gray v. Combs, 7 J.J.Marsh., Ky., 478, 23 Am.Dec. 431, 435, the court said: "Indeed, Blackstone himself, 4 Com. 180, holds this language: 'Such homicide as is committed for the prevention of any forcible and atrocious crime, is justifiable by the law of nature, and also by the law of England, as it stood so early as the time of Bracton, and as it is since declared in statute 24 Hen. VIII., c. 2.' He then cites the Jewish law, which punishes no theft with death, yet justifies homicide in cases of nocturnal housebreaking: 'If a thief be found breaking up, and he be smitten that he die, no blood shall be shed for him; but if the sun be risen, then shall blood be shed for him.' He then cites the law of Athens, where, if any theft was committed by night, it was lawful to kill the criminal if taken in the fact, and the transcription of the same law into the Roman twelve tables, and concludes thus: 'which amounts very nearly to the same as is permitted by our own constitutions.' "

In another leading case, Foster v. Shepherd, 258 Ill. 164, 101 N.E. 411, 416, Ann. Cas.1914B, 572, p. 577, the following appears: "* * * * And so, if one is committing acts in or about a dwelling, which reasonably and in good faith are believed to manifest a felonious intent, a man having the right of defense as to such dwelling may resort to force to repel the attack or prevent the felony, and his act may be justified, under the law of self-defense, although it might afterwards turn out that no felony was, in fact, contemplated, but the only design was to frighten the persons in such dwelling. Reins v. People, 30 Ill. 256; Greschia v. People, 53 Ill. 295."

Morrison v. Commonwealth, 74 S.W. 277, 24 Ky.Law Rep. 2493, 67 L.R.A. 529, 543: "Nor does the law require that there shall be actual danger to one's habitation to justify killing in defense of it; but it does require that there shall be reasonable ground for apprehending a design to commit a felony upon such habitation, and that there shall also be reasonable ground for believing the danger imminent that such design will be accomplished. Stoneman v. Com., 25 Grat., Va., 887."

The facts in State v. Terrell, 55 Utah 314, 186 P. 108, 112, 25 A.L.R. 497, are some-

what similar to those in the case at bar. A twelve-year-old boy was shot by the defendant while he was burglarizing a rabbit pen. Defendant relied upon defense of habitation. The court, after discussing the law and the instructions, said: "As heretofore pointed out, homicide is justifiable under our statutes 'when committed in defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise to commit a felony.' In this class of cases the authorities are practically unanimous that the slayer need only act upon appearances, and it is sufficient if he acts in good faith and has reasonable grounds to believe, and does believe, that under the circumstances his legal ·rights are being feloniously invaded and the necessity exists for the force used by him in the prevention of crime. Michie on Homicide, § 116, p. 374, vol. 1; New Orleans & N. E. R. Co. v. Jopes, 142 U.S. [18,] 19, 12 S.Ct. 109, 35 L.Ed. 919."

See also Com. v. Beverley, 237 Ky. 35, 34 S.W.2d 941; Newman v. State, 58 Tex. Cr.R. 443, 126 S.W. 578; 21 Ann.Cas. 718, page 724; Annotations: 25 A.L.R. 508, 32 A.L.R. 1541, and 34 A.L.R. 1488; 40 C.J.S., Homicide, §§ 101, 109 and 110; 26 Am.Jur., Homicide, §§ 153 and 155.

While no law,. ancient or modern, countenances wanton slaying—the protection and security. of life being the most vital interest of society—the law of defense of habitation and the resistance to the commission of a felony thereon invoked by appellant gives the householder the right to kill the aggressor, if such killing is necessary or apparently necessary to prevent or repel the felonious aggression.

The defense of habitation alone, without a statute making it a felony to unlawfully and maliciously injure a house, as pointed out in State v. Patterson, supra, and many other cases, gives the householder the right to meet force with force, and "an attack upon a dwelling, and especially in the night, the law regards as equivalent to an assault on a man's person, for a man's house is his castle."

The same rule limiting the amount of force which may be lawfully used in defense of other property does not apply in defense of habitation.

In State v. McCracken, 22 N.M. 588, 166 P. 1174, 1176, the opinion of the court by Mr. Justice Roberts quotes Wharton on Homicide (3rd Ed.) § 526: "'While the law justifies the taking of life when necessary to prevent the commission of a felony, one cannot defend his property, other than his habitation, to the extent of killing the aggressor for the mere purpose of preventing a trespass.'"

See also State v. Bailey, 27 N.M. 145, 198 P. 529, and State v. Waggoner, 49

N.M. 399, 165 P.2d 122. Chief Justice Sherwood in the case of Morgan v. Durfee, 69 Mo. 469, 33 Am.Rep. 508, after stating that defendant's rights were of a two-fold nature, defense of his habitation and defense of his person, said:

"In Pond v. People, 8 Mich. 150, a very well considered case, where the accused was tried for murder and found guilty of manslaughter, the death having occurred from a gun-shot wound, at the out-house of the prisoner where his servants slept, near his dwelling, and it was insisted that he was only charged with excusable or justifiable homicide, Campbell, J., remarked: 'The first inquiry necessary is one which applies equally to all grounds of defense; and is whether the necessity for taking life, in order to excuse or justify the slayer, must be one arising out of actual or imminent danger; or whether he may act upon a belief, arising from appearances which give him reasonable cause for it, that the danger is actual and imminent, although he may turn out to be mistaken. Human life is not to be lightly disregarded, and the law will not permit it to be destroyed unless upon urgent occasion. But the rules which make it excusable or justifiable to destroy it under some circumstances are really meant to insure its general protection. They are designed to prevent reckless and wicked men from assailing peaceable members of society, by exposing them to the danger of fatal resistance at the hands of those whom they wantonly attack and put in peril or fear of great injury or death; and such rules, in order to be of any value, must be in some reasonable degree accommodated to human character and necessity. They should not be allowed to entrap or mislead those whose misfortunes compel a resort to them. Were a man charged with crime to be held to a knowledge of the facts precisely as they are, there could be few cases in which the most innocent intention or honest zeal could justify or excuse homicide. * * * The prisoner who is to justify himself can hardly be expected to be entirely cool in a deadly affray, or in all cases to have great courage or large intellect; and he cannot well see the true meaning of all that occurs at the time; while he can know nothing whatever * * * concerning the designs of his assailant any more than can be inferred from appearances.' These views are remarkably well expressed, * * *

"And this right of defending one's dwelling is in some sense superior to that of the defense of his person; for in the latter case it is frequently the duty of the assaulted to flee, if the fierceness of the assault will permit, while in the former a man assaulted in his dwelling is not obliged to retreat, but may stand his ground, defend his possession, and use such means as are absolutely necessary to repel the assailant from his house, even to the taking of life. Pond v. People, supra, and cases cited; 3

Greenl.Ev., Secs. 65, 117; State v. Patterson, 45 Vt. 308, s.c., 12 Am.Rep. 200; Parsons v. Brown, 15 Barb.,N.Y., 590."

█ And in this case, if appellant has been personally attacked with stones, under the common law, it would have been his duty to flee rather than shoot. State v. Sipes, 202 Iowa 173, 209 N.W. 458, 47 A.L.R. 407. But a felonious attack on his habitation at midnight by unknown persons whose purpose in making the attack was only a matter of surmise, gave the appellant the right to instantly meet force with force, and if reasonably necessary, slay the aggressor.

In Cook's Case, 79 Eng.Rep.Reprint 1063, where it is said everyone must defend his own house, the distinction is noted between killing a known person in the daytime while he is unlawfully attacking a habitation, and the killing of an unknown person at night, the first being manslaughter and the latter justifiable homicide.

Mr. Justice Cardozo, in People v. Tomlins, 213 N.Y. 240, 107 N.E. 496, 498, Ann. Cas.1916C, 916, commenting upon the right of one to stand his ground in his own dwelling, quoted from Jones v. State, 76 Ala. 8, 14: "Whither shall he flee, and how far, and when may he be permitted to return?"

And in Bohannon v. Commonwealth, 8 Bush, Ky., 481, 8 Am.Rep. 474, 477, the court said: "It was misleading to instruct the jury, under the proof in this prosecution, that Bohannon's right of self-defense did not arise until he had 'done everything in his power to avoid the necessity' of slaying his adversary. He might have avoided such necessity by secreting himself so that he could not be found, or by abandoning his home and seeking safety in some remote part of the country; but under the law he was not required to resort to either of these methods of securing his personal safety."

One may not be driven from his home by a midnight felonious attack thereon, or a series of felonious attacks, calculated to instill fear and apprehension, or mental suffering beyond endurance. The record contains evidence, some of which is quoted above, that appellant and his wife, who were wholly free from fault, suffered intensely from apprehension of violence at the hands of the unknown intruder into their home; and, that they conjectured that the same party was responsible for the later attacks upon it.

The automobile has changed the habits and customs of criminals, as well as other folk, since frontier days. The modern assassin instead of lying behind a log, shoots his victim from a high-powered car and speeds away. The persistence of the assailants tended to inflame the fear in the mind of appellant of assassination. Appellant could only infer the motive from the

deeds, since he knew not the identity of his enemy, and ignorance serves to increase rather than lessen fear. "Like the greatest virtue and the worst dogs, the fiercest hatred is silent." It was a reasonable apprehension that there was at least one bold, reckless and dangerous criminal involved, and the offenses of the intruder and the midnight attacks on the house were not such as are usually perpetrated by juveniles; nor did appellant have reason to believe that the man who had entered his house had enlisted the services of juveniles in making the midnight attack upon his home.

When the police officers visited appellant's home on Wednesday night prior to the tragedy they directed their inquiries to the ascertainment of the identity of the enemy or enemies of appellant, and no one suggested that juveniles might be involved.

There are cases reported where juveniles have been shot while committing burglary, like Viliborghi v. State, supra; State v. Terrell, supra, and People v. Silver, 16 Cal.2d 714, 108 P.2d 4, and while engaged with men in committing other offenses in the night, like Patten v. People, 18 Mich. 314, 333, 100 Am.Dec. 173, and Higgins v. Minaghan, 78 Wis. 602, 47 N.W. 941, 11 L.R.A. 138, 23 Am.St.Rep. 428, but counsel have cited no case, and we have found none, where the facts were similar to those in the case at bar.

The connection, if any, between the intruder into appellant's home and the midnight attacks thereon is of small moment, since the matter should be considered solely from the viewpoint of appellant at the time the fatal shot was fired. And it was not unreasonable for him to surmise that both were designed by the same person.

 Whether the amount of force used by appellant was more than the attack warranted was a question for the jury to determine, under proper instructions from the court. And the most difficult point to impress on the minds of the jury in this class of cases is that the danger, or apparent danger, must be considered from the standpoint of the prisoner at the time the shot was fired. In the language used in State v. Roybal, 33 N.M. 187, 191, 262 P. 929, 931: "That the danger was to be judged, not according to the actual facts as they developed at the trial, but according to the facts as the jury might find that they appeared to the appellant at the time."

While all the authorities agree that the jury should put themselves in the place of the prisoner, surrounded by the circumstances and exposed to the influences to which he was exposed, it is realized that it is difficult for the jury while deliberating on this question not to consider facts later proved but not known to the prisoner at the time. In fact, Professor Wharton uses as

a comparison: "A test about as inapplicable as would be that of the jury who deliberate on events after they have been interpreted by their results."

The learned trial judge fell into reversible error in refusing requested instruction relating to appellant's right to act in view of the condition of his wife and the effect the repeated assaults had upon her. Testimony had been given tending to prove alarming impairment of the health of appellant's wife, and he was entitled to have the issue submitted to the jury under proper instructions from the court. State v. Hughes, 43 N.M. 109, 86 P.2d 278; State v. Walton, 43 N.M. 276, 92 P.2d 157.

In the case of Patten v. People, supra, the mother of the defendant was in feeble health and the fear and excitement caused by threats and conduct of rioters near the habitation produced upon her alarming effects. The court said: " * * * I can see no sound reason why the danger to the mother from their conduct should not have excused the conduct of defendant towards them to the same extent as if the danger to her life had resulted from an actual attack upon her person, or the like danger to the defendant from an attack upon him. And the defendant would, I think, have the right to resort to the same means of protection in the one case as in the other."

A similar case is that of Higgins v. Minaghan, 78 Wis. 602, 47 N.W. 941, 943, 11 L.R.A. 138, 23 Am.St.Rep. 428, 433, from which we quote: "2. We do not think the defendant was bound to notify the charivari party that their shooting, noise, and tumult were causing terror and fright to his wife and children, and were seriously injuring them in mind, body, and health. This was the third night these persons had been engaged in these unlawful and criminal proceedings. On the first night they came the defendant had warned them away, and directed them to desist. The rioters themselves knew, or should have known, that their acts and conduct about the house, in the night, were well calculated to produce terror and fright, and injuriously affect the defendant's family. This was the direct, necessary, and almost inevitable consequence of their acts. * * * So we think it was error to charge that the defendant was bound to inform the charivari party of the fact that their riotous conduct was endangering the life of his wife and children, before taking effectual means, by shooting or otherwise, to drive them away. The circuit judge evidently held that the defendant had no right to fire into the body of rioters without notice, and without having commanded them to disperse; but upon the undisputed facts of the case the law imposed upon him no such duty."

Appellant had no time or opportunity to notify the assailants, and being without knowledge of their identity or their purpose in making the attacks at night, reasonably feared personal violence at their hands if he had exposed his person.

Appellant complains that the court erred in instructing the jury "that the killing must be done for prevention of a felony and not as a punishment for felony already committed." The facts in this case are that the first and fatal shot was fired immediately after rocks struck the home of appellant, when the car was forty-eight feet from appellant's house, and the second shot was fired after the automobile on which the deceased and others were riding had traveled thirty-six feet at a rate of ten to fifteen miles per hour on a street in front of appellant's house. The car never stopped. The shot from appellant's gun struck one of the boys before he had thrown the rock which he held in his hand. Other rocks were found in the car. The time between the two shots was about two seconds, according to the testimony of the state's witness.

When one's home is attacked in the middle of a dark night by persons riding in an automobile, the householder, being unable to determine what weapons the assailants have, is not obliged to retreat but may pursue his adversaries till he finds himself out of danger. Two seconds is not too long in a case of this sort within which the householder might reasonably expect further attack. It was reversible error to give such an instruction where it was not apparent whether they were intending to abandon the attack. Hayner v. People, 213 Ill. 142, 72 N.E. 792; Wilson v. State, 46 Tex.Cr.R. 523, 81 S.W. 34; Palmer v. State, 9 Wyo. 40, 59 P. 793, 87 Am.St.Rep. 910; People v. Lewis, 117 Cal. 186, 48 P. 1088, 59 Am.St. Rep. 167; State v. Manns, 48 W.Va. 480, 37 S.E. 613; 26 Am.Jur. p. 262, 40 C.J.S., Homicide, §§ 97, 101, pp. 956, 960.

In the case of People v. Silver, 16 Cal. 2d 714, 108 P.2d 4, 8, the Supreme Court said:

"We are of the opinion that the instructions were erroneously given. When the charge to the jury, though a correct statement of legal principles, is extended beyond such limitations so as to cover an assumed issue which finds no support in the evidence it constitutes error. People v. Savinovich, 59 Cal.App. 240, 244, 210 P. 526. * * *.

"Where errors in instructions occur, the question always arises as to whether or not they are prejudicial. Here it may be said that where the proof of a defendant's guilt is clear, and no extenuating circumstances appear, such errors may not be prejudicial. But where a case, such as the one at bar, is what may be termed a

'close' case, and where the erroneous instructions concern matters vital to the defense of the defendant, and may have resulted in a miscarriage of justice, we are of the opinion that such errors must be regarded as prejudicial and should result in a new trial for the defendant."

Appellant assigns error based upon an instruction, in part, as follows: "The statutes of New Mexico provide that the unlawful and malicious destruction of or injury to a building located upon lands to which any person has a good and indefeasible title under the laws of the United States or New Mexico is a felony and any person found guilty of the malicious destroying or injuring of any such building is punishable by imprisonment in the penitentiary. *The injury to such building, however, to be felonious, must be of a substantial character, that is to say, one which lessens the utility or value of the building.*" (Italics ours.)

Appellant complains that by the addition of the last sentence and use of other language of like import in the instruction the Court deprived him of a substantial defense. The testimony of the state's witnesses disclosed that the stones thrown by deceased and his companions had done some damage to the dwelling of appellant, and he contends that the statute is plain and that it was error for the court to import the last sentence quoted above into the statute.

Chief Justice Roberts in the case of Harrison v. Harrison, 21 N.M. 372, 155 P. 356, 360, L.R.A.1916E, 854, said:

"The fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature. This intention, however, must be the intention as expressed in the statute, itself, and where the meaning of the language used is plain, it must be given effect by the courts. This is a universal rule. 36 Cyc. 1106.

" 'The Legislature must be understood to mean what it has plainly expressed, and this excludes construction.' Lewis' Sutherland Statutory Construction, § 366."

See also Vukovich v. St. Louis, Rocky Mountain & Pacific Co., 40 N.M. 374, 60 P.2d 356; Moruzzi v. Federal Life & Casualty Co., 42 N.M. 35, 75 P.2d 320, 115 A.L.R. 407; Griffith v. Humble et al., 46 N.M. 113, 122 P.2d 134; Giomi et al. v. Chase et al., 47 N.M. 22, 132 P.2d 715.

The English courts have a similar rule. Maxwell on the Interpretation of Statutes, Eighth Edition, p. 14 states: "It is but a corollary to the general rule in question, that nothing is to be added to or to be taken from a statute, unless there are similar adequate grounds to justify the inference that the Legislature intended something which it omitted to express (1). 'It is a strong thing to read into an Act of Parliament words which are not there, and, in the absence of clear necessity, it is a wrong

thing to do' (m). 'We are not entitled to read words into an Act of Parliament unless clear reason for it is to be found within the four corners of the Act itself' (n)." Citing: (1) Tindal C. J.; (m) Lord Mersey, Thompson v. Goold, 79 L.J. K.B. 911; (n) Lord Loreburn L.C., Vickers v. Evans, 79 L.J.K.B. 955.

The language of this statute is plain, its meaning clear. When the whole statute is considered we find that the amount of the injury or damage suffered by the owner is not the measure of the crime. On the contrary, it arbitrarily says: the unlawful and malicious destruction or injury of a building "is hereby declared a felony." 1941 Comp. § 41-4712. It makes fence cutting a felony, although a wire fence may be mended at small cost. If the Legislature had intended to fix a minimum of injury which would constitute a felony they, presumably, would have made it definite like the dividing line between grand and petit larceny. The fact that the penalties are drastic, will not, standing alone, authorize exception therefrom of acts within the spirit and letter of the law. "It is safer to adopt what the legislature have actually said, than to suppose what they meant to say." United States v. Chase, 135 U.S. 255, 10 S.Ct. 756, 758, 34 L.Ed. 117.

Since the state makes the laws they should be construed most strongly against it and in favor of the prisoner if they are ambiguous. Section 5609, Sutherland Statutory Construction (3rd Edition) says: "The doctrine of giving penal statutes a strict construction is founded upon the public policy of protecting the interests of those being punished. * * * A different standard may be applied in each different case. * * * Another point of demarcation is where the penalty is measured by culpability or some arbitrary standard on the one side, and where the penalty is measured by actual damages on the other."

This statute, N.M.1941 Comp. Sec. 41-4712, was enacted in 1891. The bill was amended and, no doubt, was given due consideration. It might be noted that the roster of the Legislature of 1891 bears the names of the men who became the first United States Senators from New Mexico —both able lawyers—and also the name of the first Governor of this State.

38 C.J. 365, Sec. 12, says: "The value of the property injured or destroyed is immaterial, in the absence of an express provision excluding property of less than a certain value, * * *." Citing: Ashworth v. State, 63 Ala. 120; Heron v. State, 22 Fla. 86; Moody v. State, 127 Ga. 821, 56 S.E. 993; Holder v. State, 127 Ga. 51, 56 S.E. 71.

The suggestion was made in argument that these old statutes enacted in a sterner period of the history of the commonwealth are not adapted to the age of the automo-

biles and delinquent youth. We can only point out that the legislature enacts the laws.

 After a careful consideration of the entire statute we are of the opinion that the import of words is not necessary to express the obvious and plain meaning of the Legislature, and that the use of the sentence in the instructions to which objections were made by appellant was prejudicial error. State v. Sisneros, 42 N.M. 500, 82 P.2d 274; State v. Lang, 87 N.J.L. 508, 94 A. 631, 10 A.L.R. 4.

For the reasons stated, the judgment of the trial court will be reversed; with instructions to grant appellant a new trial; and

It is so ordered.

BRICE and LUJAN, JJ., concur.

BICKLEY, J., not participating.

SADLER, C. J., dissents.

SADLER, Chief Justice (dissenting).

I disagree with the holding of the majority that the court erred in refusing defendant's requested instruction relating to his right to act in view of the condition of his wife and the effect that prior assaults on their home had produced on her. This requested instruction is found in paragraph VIII of defendant's requested instructions and reads: "Evidence has been introduced tending to prove that the series of offenses have been committed by the deceased and other parties against the home of the defendant and that as a result thereof the defendant's wife had become extremely nervous and her health by reason thereof was failing, the defendant had the right to take such steps as would appear to a reasonable and prudent man under all of the facts and circumstances to stop the molestation to which he and his wife were being subjected and if you believe from the evidence or have a reasonable doubt thereof that such evidence is true and that it appeared to the defendant under all of the facts and circumstances as a reasonable man that the only way in which the disturbances could be stopped was by acting in the manner in which he acted, then it will be your duty to acquit the defendant."

As written this requested instruction shows such poor draftsmanship that the omission of some language or erroneous transcription of other is suggested. The form of it alone as it appears in the transcript would justify the trial court's action in denying the request. But this is not my only objection to it. It is bad in substance for its generality. It covers the defendant's acts with blanket authority to choose the means of redressing a wrong, then gives it into the hands of the jury to speculate upon the wisdom and justification of the means employed. A likely result—as many ideas as there are jurors.

I think an instruction on the effect of these prior assaults on the wife's health and physical condition, insofar as the same could be shown to have influenced defendant's actions, would have been proper. Possibly, all that is meant by the language of the prevailing opinion is that *some* instruction should have been given. If so, I agree with it. But such is not its language. Where given, however, the instruction should be properly safeguarded by a statement of the limitations attending an exercise of the right of defense of person, property, family or habitation. Not left, as it is by the refused instruction in a practical application by the jurors, to a consideration and guess by each as to what he would have done if he had stood in the defendant's shoes.

The majority opinion says it was reversible error for the court to instruct the jury "That the killing must be done for prevention of a felony and not as a punishment for felony already committed"—where it was not apparent whether they (the deceased and his companions) were intending to abandon the attack. This is to say it was not issuable before the jury whether the attackers had abandoned the attack. I disagree with this appraisal of the testimony. Indeed, I think the jury justifiably could have believed that the deceased and his companions had abandoned the attack and that they were fleeing from the scene in the car conveying them when defendant fired the second shot. Such a finding is within the jury's verdict.

Nor do I favor the literal construction adopted by the majority in interpreting the statute making it a felony maliciously to destroy or injure any building on lands to which another has a good and indefeasible title. 1941 Comp. § 41-4712. The trial court instructed the jury as follows: "The statutes of New Mexico provide that the unlawful and malicious destruction of or injury to a building located upon lands to which any person has a good and indefeasible title under the laws of the United States or New Mexico is a felony and any person found guilty of the malicious destroying or injuring of any such building is punishable by imprisonment in the penitentiary. *The injury to such building, however, to be felonious, must be of a substantial character, that is to say, one which lessens the utility or value of the building.*" (Italics mine.)

The majority opinion holds so much of the foregoing instruction as is italicized is erroneous. In other words, the extent of the injury to be inflicted is immaterial as I read and understand the majority view. I think this construction of the statute is too narrow and wholly unwarranted, especially in view of the fact that under the laws of this state one may kill when resisting an attempt to commit a felony. See 1941 Comp. § 41-2413. It

would be injustice of the rankest sort for the court to have to instruct a jury that an accused was justified in killing a deceased known to be attempting nothing more serious than to scratch some paint off a building with a pocket knife. I think reason must be read into all of these statutes. In my opinion, it is unreasonable to eliminate from the statute in question inquiry into the extent of the injury attempted. This leaves it still open to the jury to view the matter from the standpoint of appearances and knowledge reasonably to be imputed to him, defendant, as of the moment of the offense.

I see no error in the court's instruction quoted last above.

For the reasons given I dissent.

On Rehearing.

PER CURIAM.

This cause coming on to be heard on rehearing, Chief Justice BRICE, Mr. Justice LUJAN and Mr. Justice SADLER sitting, and the Court having heard the oral arguments and considered the briefs of counsel and being well and sufficiently advised in the premises, presents a division of opinion as follows: Mr. Justice SADLER remains of the same opinion expressed in his dissent from the original opinion and thinks the opinion filed should be withdrawn and the judgment appealed from affirmed; Mr. Chief Justice BRICE and Mr. Justice LUJAN think the opinion on file should stand as written, thus adhering to the views entertained by them at the time they expressed their concurrence by signing the same.

Wherefore, it thus appearing that a majority of the Court cannot be secured favoring the withdrawal of the opinion filed (if in fact it could be secured from a full court), and the Court being without right under the decision rendered in Flaska v. State, 51 N.M. 13, 177 P.2d 174, to call in justices or judges not participating in the original decision, to participate in the consideration of this motion, the opinion heretofore filed, reversing the judgment and remanding the cause with instructions to grant appellant a new trial, will stand.

It is so ordered.